**UNITED STATES of America**

**v.**

**IRA S. BUSHEY & SONS, INC., et al.**

**Civ. A. No. 6380.**

United States District Court,
D. Vermont.

Aug 21, 1973.

See also D.C., 346 F.Supp. 145.

George W. F. Cook, U. S. Atty., George R. Ciampa, Atty., Enforcement Branch, Rutland, Vt., for plaintiff.

Ryan, Smith & Carbine, Rutland, Vt., and Christopher E. Heckman, McHugh, Heckman, Smith & Leonard, New York City, for defendants Ira S. Bushey & Sons, Inc., Spentonbush Transport Service, Inc., and Tanker Hygrade No. 8, Inc.

Donald E. O'Brien, Burlington, Vt., for defendants Northern Oil Co., Inc., and Northern Terminals, Inc.

## FINDINGS, OPINION and ORDER

OAKES, Circuit Judge (Sitting by Designation as District Judge).

### FINDINGS

1. Defendant Ira S. Bushey & Sons, Inc. (hereinafter "Bushey"), is a New York corporation having offices at 764 Court Street, Brooklyn, New York.

2. Spentonbush Transport Service, Inc. (hereinafter "Spentonbush"), is a wholly-owned subsidiary of Bushey and a New York corporation having offices at 500 Fifth Avenue, New York, New York.

3. The directors of Bushey and the directors of Spentonbush are the same persons, Francis B. Bushey, Ira S. Bushey and Raymond J. Bushey. The officers of Bushey and Spentonbush are substantially the same.

4. Defendant Bushey wholly owns approximately 40 corporations, each of which owns vessels used in the transportation of liquid cargoes; of these approximately 25 tugs and barges are capable of operating in the Vermont waters of Lake Champlain, a navigable water of the United States, and most of these vessels do in fact operate in Vermont waters. Among such vessels are Tanker Hygrade No. 8, owned by defendant Tanker Hygrade No. 8, Inc., and the tug Carmelite owned by defendant Tug Carmelite Corporation.

5. Spentonbush is and has been for a number of years engaged in the business of the solicitation of orders for transportation of liquid cargoes by water, and of arranging for performance of such transportation by vessels, and it gives preference to vessels of Bushey subsidiaries in arranging water transportation contracts.

6. Spentonbush collects transportation charges for such water transportation, deducts a commission and remits the balance to the owners of the particular tank barge and tug boat involved.

7. Since December, 1970, crews used by vessels owned by Bushey subsidiaries have been hired and employed either by Spentonbush or by Hygrade Operators, Inc., a wholly-owned subsidiary of Bushey.

8. None of the wholly-owned, vessel-owning, corporate subsidiaries of Bushey operating in Lake Champlain employs its own crew, its own accounting personnel, or any other employees except for its officers. The officers and directors of each subsidiary corporation, except Spentonbush, are identical to the officers and directors of defendant Bushey.

9. The net profit or surplus from the operations of Spentonbush and other wholly-owned Bushey subsidiaries are remitted to Bushey by way of corporate dividends.

10. Navigation on Lake Champlain is governed by the Navigation Rules for Inland Waters, 33 U.S.C. §§ 151–295, and by such other Navigation Rules as the United States Coast Guard has promulgated pursuant to the authority given it by 33 U.S.C. § 157.

11. Each of the vessels operated by the defendants on the waters of Lake Champlain, particularly in the Burlington and Shelburne area, is an enrolled vessel of the United States and is duly licensed to carry on the coastwise trade; each of the barges operated by the defendants on the waters of Lake Champlain, particularly the Burlington and Shelburne area, has been inspected by the United States Coast Guard and issued a Certificate of Inspection. The Federal Maritime Commission has issued to the operators of each of the barges of the defendants using the waters of Lake Champlain, particularly the Burlington and Shelburne area, a Certificate of Financial Responsibility (Oil Pollution), attesting that the operator has evidenced financial responsibility to meet the liability to the United States of America which may result from the discharge of oil into or upon the navigable waters of the United States, adjoining shore lines, or into or upon the waters of a contiguous zone. Much damage may occur, however, from oil spills in Lake Champlain that is not reimbursable in money.

12. During the period from May 1 to December 1 each year, or thereabouts, petroleum products are transported by tank barges and tugboats from the Hudson River locks to the Burlington and Shelburne harbors. In 1970, 1971 and 1972 over 500,000 tons of diesel fuel, fuel oil, gasoline, jet fuel and kerosene was thus transported.

13. In 1970 Bushey subsidiaries transported into Lake Champlain and delivered about 45 million gallons of petroleum products to unloading points on Vermont shores, ten of which are in Burlington Harbor.

14. In 1971 alone, approximately ten barges of wholly-owned Bushey subsidiaries and one barge of a partly owned corporation, the barge Erie, plus a number of tugs owned by other Bushey subsidiaries, transported 175 barge-loads of petroleum products into Lake Champlain, 53 of which delivered approximately 125,000 tons, or about 36 million gallons of petroleum to Vermont shores.

15. In 1972, Bushey subsidiaries transported into Lake Champlain and delivered about 43 million gallons of petroleum products to Vermont shores.

16. In each of the years 1970, 1971 and 1972, Bushey subsidiaries transported into Lake Champlain and delivered to Vermont shores approximately 25 per cent of the total amount of petroleum delivered to Vermont shores during each of said years. All of this was shipped from points or places outside Vermont and thus this was entirely interstate transportation.

17. From April, 1967, through December, 1970, the Army Corps of Engineers investigated a total of ten oil spills in the Burlington-Shelburne harbors. Vessels of Bushey subsidiaries were involved in five of these oil spills.

18. During 1971 and 1972, vessels of Bushy subsidiaries have been involved in four additional oil spills affecting Vermont waters of Lake Champlain, or a total of nine such spills during the period April 1967–December 1972.

19. The effect of an oil spill on water varies with the kind of spill—jet fuel evaporates quickly while heavy heating oil does not—and environmental conditions; with certain kinds of oil under certain conditions, as those of turbulence, shear forces at the oil-water interface may prevail causing an influx of oil into the water column rather than mere confinement of it to the surface where it may be more easily contained.

20. The basic steps for reducing the environmental effects of an oil spill include surrounding the spill with an oil containment boom, that is, a floating barrier with skirt and sail, and then removing the oil by oil-skimming machines and "sorbents" (either ab- or ad-) or both. The art of oil spill clean-up is not very advanced and is less effective in certain areas, as for example those of marsh-grass which sustain life for many creatures and organisms, than in others.

21. On April 30, 1967, tank barge Hygrade No. 30, owned by Tanker Hygrade No. 30, Inc., a wholly-owned subsidiary of Bushey, pumped approximately 14,500 gallons of jet fuel into the waters of Lake Champlain while discharging its cargo at the Northern Oil Terminal or dolphin in Burlington harbor.

(A) The Tanker Hygrade No. 30, Inc., started pumping around midnight.

(B) The pumping took six or seven hours but the strong odor of gasoline remained on the lake front for about 12 hours. A sticky petroleum product was present on the shore line and had entered several small bays. The petroleum product from the spill remained visible on the shore for several days.

(C) The spill was due to a leak in Northern Oil's pipe coming from the dolphin to the shore.

(D) But it may be inferred that the Tanker Hygrade No. 30 continued to pump jet fuel into Vermont waters of Lake Champlain for some time after the tankerman had reason to know of the leak, since the smell of vapor was strong enough to awaken a nearby resident.

22. On August 27, 1967, tank barge Hygrade No. 28, owned by Tanker Hygrade No. 28, Inc., a wholly-owned subsidiary of Bushey, ran aground at Proctor Shoal while approaching Shelburne Harbor, Vermont, causing a spill of an estimated 1,600 gallons of gasoline into Vermont waters of Lake Champlain.

(A) The tank barge Hygrade No. 28 was being pushed by tug Colleen Kehoe at the time of the grounding. The Colleen Kehoe was under the hire of Spentonbush which had selected the tug, and Spentonbush received a commission for this service, which commission was a fi-

nancial benefit to Bushey. The negligence of the Colleen Kehoe caused the spill.

(B) A gas spill of this type presents a risk of damage by fire to lake front property.

(C) The grounding resulted in a rupture of the starboard bow of the Tanker Hygrade No. 28, Inc., from which came a steady flow of gasoline. It was necessary for the Coast Guard to lay out foam over a large area covered by the spill. The Coast Guard, as a safety measure, sealed off the area of the spill from Lake traffic.

23. On June 26, 1969, tank barge Hygrade No. 30, owned by Tanker Hygrade No. 30, Inc., delivered a cargo of jet fuel at Northern Oil Terminal dolphin in Burlington harbor; caps or flanges were not placed on the ends of the pipe lines at the dolphin by the crew of the Tanker Hygrade No. 30, causing an oil or jet fuel spill into Vermont waters of Lake Champlain. The Northern Oil personnel were also negligent in not discovering that the caps or flanges were missing.

24. On October 5, 1969, tank barge Hygrade No. 26, owned by Tanker Hygrade No. 26, Inc., a wholly-owned subsidiary of Bushey, while under tow by the tug Champlain, owned by New York Scow Corporation, a wholly-owned subsidiary of Bushey, ran aground at Proctor Shoal as it was approaching Shelburne Harbor, Vermont, causing at least 10,000 gallons of gasoline to spill into Vermont waters of Lake Champlain.

(A) The gasoline spill caused a fire hazard, requiring the Coast Guard to close Shelburne Harbor for about 24 hours.

(B) The spill covered an area on Lake Champlain at least 400 feet by one-half mile, and the spill was at least one-half inch thick, and possibly as thick as 1½ inches.

(C) The grounding occurred near the buoy at Proctor Shoal. Chief Schwencke of the United States Coast Guard personally checked the location of the buoy after the grounding and found the buoy to be "somewhat" but not very far off station, that is, that the buoy was 25 to 30 feet off station.

(D) While, accordingly, the spill may not be said to have occurred as a result solely of the negligence of the defendants, the episode demonstrates nevertheless the dangerousness of defendants' activities and the necessity for high standards of care on their part.

25. On August 15, 1970, tank barge Blue Line No. 108, owned by Tanker Hygrade No. 4, Inc., a wholly-owned subsidiary of Bushey, during unloading operations at the Gulf Oil Terminal in Burlington harbor, sustained a broken hose at the flange on the barge, resulting in the spillage of about 1,000 gallons of No. 2 fuel oil into the Vermont waters of Lake Champlain.

(A) The cause of the spill was the rupturing of the hose at the thimble. The hose belonged to the Blue Line No. 108, not the Gulf Terminal.

(B) The oil spill was extensive enough to require the United States Coast Guard to place 250 feet of boom in the immediate area of the spill in an attempt to contain the oil slick. Later, oil was discovered in a cove north of the spill area, and an additional 750 feet of boom was floated in an effort to contain the oil.

(C) Clean Water, Inc., of Toms River, New Jersey, performed a clean-up operation on August 16 and 17. Bushey paid for this clean-up.

(D) The oil spread to North Beach, a public bathing beach, with camping facilities, operated by the Park Department of the City of Burlington, Vermont. Daniel Dion, a Park Department employee, arrived at North Beach just before noon on August 15, 1970, to assist in cleaning the beach of oil. Dion observed that oil covered the 100-foot wide beach to a depth of about three feet from the water, and extended along the entire one-quarter mile length of North Beach.

(E) While Dion was waiting for clean-up equipment to arrive, he noticed several gulls that came in and landed in the water. The gulls could not fly, after alighting on the oily water. The gulls then struggled to the shore and then toward the underbrush on the shore. The gulls still could not fly because of their oil-soaked condition. Dion attempted to care for two of the gulls, but they died. The others struggled into the underbrush.

26. On May 21, 1971, tank barge Hygrade No. 26, owned by Tanker Hygrade No. 26, Inc., was delivering oil to the Shell Oil Terminal in Burlington harbor. While doing so, due to a crack in the hull of the barge, about 20 gallons of oil leaked into the Vermont waters of Lake Champlain. Witness Sitler of the United States Coast Guard observed the oil bubbling from the barge, and it disappeared in about an hour.

27. On June 1, 1971, the Hygrade No. 8, a tank barge owned by Tanker Hygrade No. 8, Inc., a wholly-owned subsidiary of Bushey, while moored in Burlington harbor at the dolphin owned by Northern Oil Company, Inc., was rammed by the tugboat Carmelite II, owned by the Tug Carmelite Corporation, a wholly-owned subsidiary of Bushey, which resulted in damage to the hull of the Hygrade No. 8, causing a spillage of about 5,000 gallons of gasoline into the Vermont waters of Lake Champlain.

(A) At the time of the accident, the officer in charge of the Carmelite II was Thomas Bradley. Bradley did not hold a pilot's license issued by the United States Coast Guard. Bushey does not require such licenses, nor are such licenses required by the Coast Guard.

(B) Bradley consumed at least five or six beers between 12:00 noon and 6:00 p. m. just prior to the accident at 9:15 p. m. on June 1, 1971, and was under the influence of alcohol at the time of the accident. The accident was, however, negligently, not intentionally, caused.

(C) Neither Bushey nor Spentonbush had ever issued any orders to its tug or barge employees prohibiting consumption of alcoholic beverages prior to reporting to work.

(D) The gasoline spill from the Hygrade No. 8 came from a six-inch crack above the waterline of the barge.

(E) The slick caused by the spill was extensive enough to require the Burlington Fire Department to stand by on the beach. The Burlington Light Station and the Burlington Fire Department monitored the spill throughout the night of June 1 and 2, 1971.

28. On September 30, 1972, while under way between Locks 9 and 11 of Lake Champlain Canal, barge Hygrade No. 18, owned by the Tanker Hygrade No. 18, Inc., a wholly-owned Bushey subsidiary, was struck by the tank barge Blue Line No. 107 being pushed by the tug Seneca, both owned by corporations which are wholly-owned by Bushey subsidiaries. The resulting collision caused the Hygrade No. 18 to strike rocks on the bottom of the canal which caused No. 6 fuel oil to leak from Hygrade No. 18 into the canal. The canal flows north into Vermont waters of Lake Champlain, but there is no evidence that the oil spilled in the canal did so flow. But Hygrade No. 18 proceeded into Lake Champlain and toward Ticonderoga after the ramming and oil was seen to bubble out of it into the lake.

(A) Before the collision, the captain of the tug Kehoe, which was pushing tank barge Hygrade No. 18, was in radio communication with the captain of the tug Seneca, which was pushing tank barge Blue Line No. 107. The captain of the tug Seneca agreed to hold back at Bray Terminal, which was an area wide enough for the vessels to pass. After agreeing to do this, the captain of the tug Seneca disregarded the agreement, and proceeded about three-quarters of a mile southerly. As the tug and barge approached each other, the captain of the Kehoe brought his tug and barge to a halt and he attempted by radio to warn the Seneca and Blue Line No. 107 not to pass. The captain of the Seneca did not answer the radio warning, and the barge Blue Line No. 107 hit the Hy-

grade No. 18 while attempting to pass, resulting in the damage to the Hygrade No. 18 and a subsequent oil spill.

(B) The Hygrade No. 18 spilled between 200 and 1,145 gallons of No. 6 oil along some six miles of the canal and also in the Vermont waters of Lake Champlain.

(C) The spill from Hygrade No. 18 was such as to cause defendant Bushey to expend the sum of $150,000 in cleaning the Champlain Canal of No. 6 oil.

29. On November 6, 1972, while unloading kerosene at Metropolitan Oil Company, in Plattsburgh, New York, from tank barge Hygrade No. 8, owned by a corporation which is a wholly-owned Bushey subsidiary, a tankerman (who did hold a Tankerman's Certificate) aboard the Hygrade No. 8 failed to close a valve resulting in kerosene being pumped into Lake Champlain, from whence it may have flowed into Vermont waters of Lake Champlain.

(A) Following the spill, defendant's agent Laba went to the scene, and fired the entire crew of the Hygrade No. 8 for intoxication.

(B) The spill of kerosene was clearly visible on the waters of Lake Champlain. The wind and currents carried the spill across Lake Champlain toward Vermont waters.

30. Lake Champlain is a part of the Atlantic flyway, so-called, which is one of the five or six major arteries or flyways used by migratory birds in their flights from Canada to the United States, and points southerly, and return.

31. The migratory bird population in the Lake Champlain area commences to build up as early as August and reaches a peak in late October or November, with migratory birds being present as late as mid-December. The peak populations include waterfowl numbering around 30,000 "dabblers" and 35,000 "divers" in mid-November.

32. Migrations of waterfowl also occur in the spring months, but to a lesser amount. Lake Champlain also sustains a permanent summer population of certain types of birds.

33. Oil spills in Lake Champlain, partly because the calming effect of oil on water attracts birds, can cause serious damage and often death to waterfowl. This has happened in the past. Fortunately, despite the fact that ducks (and geese) tend to congregate in clusters, there has as yet been no major bird disaster as in Santa Barbara or San Francisco, California, or Martha's Vineyard, Massachusetts, where, the court takes judicial notice, there have been large oil spills resulting in the death of hundreds and even thousands of birds.

34. On December 13, 1964, a slick of No. 2 oil in Burlington harbor killed 14 birds in the area of North Beach owned by the City of Burlington. Similarly, at least six birds were injured by the oil spill occurring in Burlington harbor on August 15, 1970, two of which were definitely killed by the oil.

35. Oil spills are a well known hazard to waterfowl. Oil attaches to the feathers of a waterfowl causing a "leak" in the plumage. This leak affects the waterfowl in several ways. If the waterfowl is on water when it comes in contact with the oil, it can cause the bird to lose its buoyancy, and sink, and drown. In cold weather the oil on the plumage can cause freezing and death from exposure. If the waterfowl gets to land, the oil can prevent the bird from flying, which in turn affects its ability to obtain food. Additives to the petroleum product can also poison the bird.

36. The chances of rehabilitating a waterfowl which has been exposed to an oil slick are usually very small. This is due to the fact that there are few people skilled in such rehabilitation and also because the damage is often irreparable.

37. Oil spills in Lake Champlain are particularly hazardous to the canvasback duck, a diving duck which goes one to 20 feet deep in the water and which is now on the Government's protected list of waterfowl, due to its decreasing population. Between 2 and 3 per cent of the

world's population of canvasbacks pass through Lake Champlain.

38. Lake Champlain is also an area widely used by sport fishermen. Of the 55 species of fish that are found in Lake Champlain, some eight species are listed as game or sporting fish, which attract anglers.

39. Oil spills on Lake Champlain can have an adverse effect on fish life. Oil can damage or destroy spawning areas, thereby decreasing the fish population. Oil also has an indirect effect on fishing, since fish exposed to oil have an oily taste. Further, fishermen tend to stay away from lake areas which have been exposed to oil.

40. Lake Champlain provides a recreation area for boating enthusiasts, bathers and campers.

41. The City of Burlington Parks Department maintains a large municipal beach and camping facilities at the north end of Burlington harbor, known as North Beach. The beach has about 2,000 feet of shore line, and the sandy area of the beach extends from 50 to 100 feet back from the shore line. The city also plans to extend its beach area in Burlington harbor.

42. For the past several years, North Beach has had about 100,000 users during the course of the summer season. Users on peak days number as high as 8,000 people.

43. North Beach in the City of Burlington has been adversely affected by three oil spills during the last three years. The major spill affecting North Beach occurred on August 15, 1970, as a result of a· hose rupturing while the Blue Line No. 108 was discharging a cargo of No. 2 oil.

44. Any oil spill at North Beach, following the oil spill and clean-up operations, also produces a loss of attendance by users of the beach and camping facilities, because users do not return immediately after the beach is re-opened. All of this produces a non-recoupable financial loss to the Burlington Park Department.

45. The City of Burlington, Vermont, uses Lake Champlain as its exclusive source for water. It is the water supply for about 70,000 domestic, commercial and industrial users in the Burlington area.

46. The water is brought to the City of Burlington treatment plant by means of two large pipes extending 6,600 feet in length. The pipes lie below the surface of the water approximately 30 to 40 feet.

47. An extensive oil spill can adversely affect the water system of the City of Burlington. In December, 1964, an oil spill in Burlington harbor, in the area of the Northern Oil Terminal, damaged the water system to the extent that numerous complaints by water users were made to the effect that the water "tasted like kerosene." The Burlington City Health Officer was concerned about the possible toxic effect of oil additives. One of the two inlet pipes was turned off for a period of time to prevent further contamination of the Burlington reservoirs by the oil.

48. During the past five years, the nine oil spills in Vermont waters of Lake Champlain, involving Bushey controlled vessels, have either damaged, or presented a substantial risk of damage, to Vermont beaches, a major municipal water supply, and to waterfowl and fish, particularly in the Burlington-Shelburne harbor areas.

49. The booming of tank barges in Burlington-Shelburne harbors, prior to the discharges of petroleum products, is a desirable and feasible procedure to lessen the risk of, and damage from oil spills.

50. Eight hundred feet of boom, costing between $5 and $20 per foot, is sufficient boom for a normal booming of a tank barge of the size used by defendants in transporting petroleum products into Burlington-Shelburne harbor facilities. Booming requires the use of a power boat, however, and it is much more feasible, as well as less expensive, to require terminal operators to retain

booming equipment and a boat than to require each barge to carry such equipment.

51. A conference between shore based facility personnel and the crew of a tanker, prior to and during discharge of petroleum products, is a desirable aid to the prevention of oil spills. This conference, as the new Coast Guard Regulations taking effect generally on July 1, 1974, provide, should cover the following specific items:

(1) The identity of the product to be transferred.

(2) The sequence of transfer operations.

(3) The transfer rate.

(4) The name or title and location of each person participating in the transfer operation.

(5) Particulars of the transferring and receiving systems.

(6) Critical stages of the transfer operation.

(7) Watch or shift arrangement.

(8) Transfer shutdown procedures. In addition the following should be known by personnel through written orders and regulations or covered in the conference:

(9) Federal, state and local rules that apply to the transfer of oil.

(10) Emergency procedures.

(11) Discharge containment procedures.

(12) Discharge reporting procedures.

52. To prevent or lessen the danger of oil spills, it is desirable that the connection point between the barge cable and the off-shore facilities, during the discharging of petroleum products, be illuminated with an average minimum lighting intensity of five foot candle power.

53. In order to prevent or lessen spills, during the discharge of petroleum products, a certified crewman aboard a tanker should be on watch at all times to check on the pumping operation, and to watch for the possibility of spills, and to detect actual spills.

54. A tank vessel should not be offloaded of any petroleum product unless there is in operation a direct positive communications system between the shore facility personnel and the tankerman on duty and in charge of unloading. A two-way "walkie-talkie" radio is a desirable type of communication.

55. The use of alcoholic beverages by crewmen aboard tugs and barges involved in the transportation of petroleum products can be extremely hazardous.

56. A way to combat insobriety of crewmen aboard tugs and barges is to (1) make the officer in charge of the vessel responsible for his crew; (2) make certain that the officer in charge is backed up by his operators through the use of enforced personnel regulations; (3) make on duty inspections with regard to sobriety. It is impracticable, however, to try to regulate the off-duty drinking habits of tug-, barge- and tankermen.

57. The wake of a vessel operating in Burlington-Shelburne harbor can be of sufficient magnitude to cause the discharge hose of a tank barge discharging petroleum products to snap, thereby causing a spill. This hazard can be substantially lessened by prohibiting vessels in Burlington-Shelburne harbors from traveling at such a rate of speed as causes a damaging wake. It is impractical for a court to enforce such an order, however, and the making and enforcement thereof lie within the United States Coast Guard's prerogatives.

58. The use of a "contingency plan" can be an important tool in preventing oil spills from barges, and in lessening the damage from such oil spills already in progress.

59. A "contingency plan" should contain the following four elements as minimum requirements: (A) Definitions of the parties in authority to be notified if a spill occurs; (B) a listing of the names, addresses and telephone numbers

of people who should respond to an oil spill; (C) an inventory of resources and materials that are available either locally or regionally to deal with an oil spill, including a commitment to bring in outside resources where the oil pollution problem exceeds local resources; (D) the designation of one person to coordinate clean-up efforts, and who can direct the utilization of equipment and coordinate with proper federal and state authorities.

60. The duties required by a crewman aboard a tank barge, in discharging petroleum products, involve substantial skills and responsibilities. Only tankermen licensed by the United States Coast Guard are sufficiently qualified to provide such skills and handle such responsibilities.

61. Due to the numerous oil spills involving defendants Bushey and Spentonbush, and due to the violations of the Refuse Act by Bushey and Spentonbush, as appears from the records in the United States District Court for the District of Vermont, the court finds that the Government is entitled to equitable relief against defendants Bushey and Spentonbush.

62. The court finds that the numerous oil spills that have occurred together with the continuation of slack operations by defendants as above described poses a continuing nuisance threatening the general public, wildlife, lakefront property owners and the environment of Lake Champlain and its shore lines.

63. The court finds that the numerous past oil spills that have occurred, the continuation of slack operations by defendants and the damaging effects of oil spills cause a continuing threat of irreparable harm to the navigable waters of the United States and hence to the plaintiff.

## OPINION

As previously held, this court has jurisdiction of the parties and venue in the District of Vermont is proper. Public policy dictates that the veil of Bushey's and Spentonbush's separate corporate entities be pierced, since these corporations wholly own, control, manage, operate and in all ways supervise the operations of the many subsidiaries of Bushey. *See* United States v. Ira S. Bushey & Sons, Inc., No. 6380 (D.Vt., Oct. 11, 1972) (unpublished opinion on motions to sever and transfer). The subsidiaries are mere corporate shells established for purposes of avoiding tort liability to the parent for the acts of the subsidiaries which are the alter egos of Bushey and Spentonbush. *Cf.* United States v. Parfait Powder Puff Co., 163 F.2d 1008, 1010 (7th Cir. 1947), cert. denied, 332 U.S. 851, 68 S.Ct. 356, 92 L. Ed. 421 (1948). Injunctive relief against only one or a few of the subsidiaries could easily be circumvented by the parent, with the assistance of the similarly wholly owned Spentonbush, simply by using other subsidiary corporations to make petroleum deliveries to Vermont. The public interest in preserving the environmental integrity of Lake Champlain, the sixth largest lake in the country and a jewel of nature, is sufficiently paramount that the parent corporation, Bushey, which profits from the operations of its alter-ego subsidiaries, should be accountable for any violation or continuing threat of violations to that integrity.

Equitable relief is not precluded by the Federal Water Pollution, Prevention and Control Act of 1972, 33 U.S.C. § 1251 et seq. (FWPCA). Section 1371(a)(1) of the FWPCA specifically provides that the Act "shall not be construed as . . . limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this chapter." This provision was designed to "preserv[e] the authority of other Federal laws which are consistent with [the 1972 FWPCA]." S.–H.R. Conference Rep. No. 92–1236, 92nd Cong., 2d Sess., 1972 U.S.Code Cong. & Ad. News, p. 3825. *See also id.* at 3826 (noting that the saving provision of the bill was found in both House and Senate

versions and is adopted by Congress). Equitable relief has long been available under the Rivers and Harbors Act of 1899 or more specifically that section, 33 U.S.C. § 407, known as the Refuse Act, and there is no indication in the 1972 FWPCA that Congress intended to limit the equitable powers of courts under the Refuse Act. When Congress in enacting the 1972 FWPCA wanted to limit the scope of regulation under other acts dealing with pollution in navigable waters—specifically the Rivers and Harbors Act of 1910 and the Supervisory Harbors Act of 1888—it spoke clearly in doing so. *See* 33 U.S.C. § 1371(b).[1] It has *not* done so in the case of the Act of March 3, 1899. Moreover, Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), and Texas v. Pankey, 441 F.2d 236 (10th Cir. 1971), hold that there is a federal common law of nuisance and that the federal pollution control legislation is not the exclusive means by which federal policy concerning, and interest in, the quality of waters under federal jurisdiction may be protected. *See also* Askew v. American Waterways Operators, Inc., 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973) (FWPCA held not to preempt state regulation).

■ The grounds for granting equitable relief here are two:

1. The Rivers and Harbors Act of 1899, 33 U.S.C. §§ 403, 407. *See generally* Wyandotte Transportation Co. v. United States, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); United States v. Republic Steel Corp., 362 U.S. 482, 491–492, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). *See also* United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973). Plainly oil is a pollutant under that Act. United States v. Stand-ard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966). *See also* 33 U.S.C. § 1161(b)(1). In dictum the Second Circuit has said that injunctive relief may be sought by the federal government for § 407 violations. Connecticut Action Now, Inc. v. Roberts Plating Co., 457 F.2d 81, 88–90 (2d Cir. 1972). *See also* United States v. Armco Steel Corp., 333 F.Supp. 1073, 1076–1078 (S. D.Tex.1971); United States v. Florida Power & Light Co., 311 F.Supp. 1391 (S.D.Fla.1970); Note, The Refuse Act: Its Role Within the Scheme of Federal Water Quality Legislation, 46 N.Y.U.L. Rev. 304, 312–13 (1971).

2. The federal common law of nuisance. Illinois v. City of Milwaukee, *supra*, 406 U.S. at 103, 107–108, 92 S.Ct. 1385, 31 L.Ed.2d 712; Texas v. Pankey, *supra*, 441 F.2d at 241–242. As the undersigned pointed out in an article, Developments in Environmental Law, 3 ELR 50001, 50009 (1973), the old law of public nuisance is being reshaped by the courts to fit the "realities of modern technology." That is to say, under Restatement (Second) of Torts (Tent. Draft No. 17, 1971), there is no criminal requirement for public nuisance, that is, there need be no intent. *See generally* Bryson & Macbeth, Public Nuisance, the Restatement (Second) of Torts, and Environmental Law, 2 Ecology L.Q. 241 (1972). Rather, a public nuisance is "an unreasonable interference with a right common to the general public," in the words of Tentative Draft No. 17 § 821B(1). In this case one important factor conducing toward a determination that the defendants' interference with the right of the public in the waters of Lake Champlain to have those waters preserved from oil-spill pollution is "unreasonable," is the circumstance that such pollution is proscribed by the Refuse

---

1. The Federal Water Pollution and Control Act of 1972 does specify an alternate route for the Government to seek equitable relief, *see* 33 U.S.C. § 1321(e) and (1) in conjunction with Executive Order No. 11548 (July 20, 1970), reprinted in 33 U.S.C.A. note following § 1151. It specifically authorizes broad equitable relief when the Department of Interior requests the United States Attorney to act against the threat of oil pollution. The Department of Interior, however, did not request the United States Attorney to act here.

Act. § 821B(2)(b). In addition the pollution here has been of a recurring nature, although not continuous, producing long-lasting effects and substantial detriment upon the public right, with the actor—in this case, the defendants—knowing or having reason to know of that effect. § 821B(2)(c). *See* the discussion in the earlier phase of this case, 346 F.Supp. at 150. Here in fashioning the relief to be afforded to the public for the defendants' unreasonable interference with the public's rights in the waters of Lake Champlain the court has weighed the costs to the oil transportation industry, as will appear below. But that some relief is required, and permissible, there is no doubt.

 The fact that there are now outstanding navigation rules regulating the navigation of defendants' vessels, Navigation Rules for Harbors, Rivers and Inland Waters Generally, 33 U.S.C. § 151 et seq., and that pursuant to the delegation of special rule-making authority therein (33 U.S.C. § 157), the United States Coast Guard may promulgate Special Rules in respect to that regulation does not preclude the court from imposing additional requirements or conditions of operation which do not conflict with regulations now in effect. Similarly the Coast Guard rules regarding pollution prevention issued in 37 Fed.Reg. 28250 et seq. (1972) by the authority of § 311(j) of the Federal Water Pollution Control Act, which will become effective on July 1, 1974, do not preclude judicial action now. *Cf.* Illinois v. City of Milwaukee, *supra.* In the interests of uniformity, the court has of course taken those rules into account. In certain instances by merely advancing the date for compliance with certain of them from July 1, 1974, to the start of the 1974 shipping season on Lake Champlain (which will probably be in April of 1974) the court does not see any conflict therewith.

In connection with the grant of relief and the Government's requests therefor, the court believes that the following must be ordered:

1. To require the maintenance of oil containment booms around tank vessels offloading petroleum products (other than gasoline or jet fuel) would not be overly expensive in and of itself, but it seems more practically to be the province of the terminal operator since he can better train and maintain a crew to put out the boom and can better supply the boat necessary to put it out. It is within the power of the Captain of the Port to order booms and in the court's view he should do so for the 1974 shipping season. *See* 37 Fed.Reg. at 28252. If this is not done the court will entertain a further application in this respect.

2. Pre-offloading conferences will be required on July 1, 1974, under § 156.-120(q) of the new Coast Guard regulations, 46 Fed.Reg. at 28260, in any event so that there is no harm in requiring that they be held at the commencement of the shipping season. If the terminal operator refuses to comply the court will meet that contingency when it arises. The court believes, however, that Items (9)–(12) inclusive, as set forth in Finding No. 51, may be better handled by written regulation and training than by a "conference."

3. Deck lighting on *self-propelled* vessels with five foot candle intensity is required under the proposed Regulations, § 155.790, 37 Fed.Reg. at 28259, after July 1, 1974, and the court can see no earthly distinction in the necessity of deck lighting between a self-propelled and a non-self-propelled vessel, other than a limited item of expense, perhaps.

4. The court is modifying the Government's request to require inspection by a tank-vessel crewman of the integrity only of the tank vessel's equipment, the terminal operator being responsible for his own equipment. The "water surrounding the vessel" is not too vague and is subject to reasonable interpretation by court and tankerman alike.

5. A voice communications system will be required of both terminal operator and tank vessel on July 1, 1974, under the proposed Regulations, § 154.560,

37 Fed.Reg. at 28255, and § 156.120(m), 37 Fed.Reg. at 28260, respectively. If the terminal operators which Bushey serves do not see fit to use such equipment until July 1 the court will deal with that situation when it arises and in connection with any non-use will determine whether Bushey has used good faith efforts to get the terminal operators to install and utilize their end of the communications system required. Entire flexibility as to the kind of system is left up to the defendants.

6. The courts agrees with the Government that drinking while on duty, though perhaps making the bargeman's lot easier, is dangerous and that the company must take steps to prevent it. The defendants cannot, however, be expected to monitor their employees in off-duty hours, though they can and must institute inspection procedures to see that bargemen do not begin work while intoxicated.

7. The "damaging wake" request seems to the court better to lie within the Coast Guard's province both to regulate and to enforce.

8. A contingency plan to be submitted to EPA seems perfectly proper in view of defendants' past pollution proclivities.

9. To require all employees to be certified is unnecessary. The court will, however, order that at least one crew member of each tank vessel be certified.

10. The check list relating to Paragraphs 1, 2, 3 and 4 of the Order plus the EPA reports may make defendants and their employees more conscious of the necessity of pollution prevention and will, therefore, be ordered.

It is the intention of the court to submit the proposed Findings, Opinion and Order to the parties for further comment by the parties within 20 days. Absent modification of same they will take effect 30 days from the date hereof.

## ORDER

Wherefore, this court permanently enjoins defendants Ira S. Bushey & Sons, Inc., and Spentonbush Transport Service, Inc., and each of them, their officers, agents, servants, employees and attorneys, and those persons or corporations in active concert or participation with them who receive notice of this order, to operate and supervise all vessels and personnel employed by, belonging to, owned, operated, or used by them, or either of them, and by all persons and corporations owned, or controlled by, or under contract with them, or either of them, in the Vermont waters of Lake Champlain, so as to comply with the following requirements:

1. That commencing with the 1974 shipping season no tank vessel be offloaded of any petroleum product except following a conference between the person in charge of the vessel and the person in charge of petroleum transfer operations at the receiving facility, at which conference the matters are discussed and agreed upon as referred to in Finding No. 51, which is hereby incorporated herein by reference.

2. That commencing with the 1974 shipping season no tank vessel be offloaded of any petroleum product between sunset and sunrise unless the connection point between the vessel and the receiving facility is illuminated with an average minimum lighting intensity of five footcandle power, subject to United States Coast Guard approval of same.

3. That commencing with the 1974 shipping season during the off-loading of any petroleum product from a tank vessel, a crewman holding a valid tankerman's certificate from the United States Coast Guard, endorsed for the grade of product being off-loaded, make periodic checks (A) on the integrity of all equipment of the tank vessel used during the off-loading; and (B) of the water surrounding the vessel for evidences of oil pollution.

4. That commencing with the 1974 shipping season no tank vessel be offloaded of any petroleum product without maintaining a direct positive voice communications system between the person

in charge of the vessel and the person in charge of petroleum transfer operations at the receiving facility.

5. That no crew member of any vessel consume any alcoholic beverages while aboard or while on duty whether or not aboard; that no crew member bring any alcoholic beverages aboard any vessel or cause the same to be brought aboard; and that the defendants forthwith devise and implement a plan for ensuring compliance by its employees with this requirement, which plan shall include without limitation provisions for (i) frequent unannounced on-site inspection of vessels by shore-based personnel, (ii) referrals to the United States Coast Guard of suspected instances of crewmen being on duty in an unfit condition by reason of consumption of alcoholic beverages, (iii) bimonthly reports during the shipping season to the Environmental Protection Agency of the specific steps taken during the reporting period to implement this order.

6. That the defendants prepare subject to the approval of the Regional Administrator of the Environmental Protection Agency in Boston, a contingency plan outlining specific steps to be taken by its on-scene employees in the event of an oil spill from a vessel into Lake Champlain, so as to limit the adverse environmental consequences of such a spill.

7. That at least one employee of defendants or their wholly-owned subsidiaries performing any task aboard a tank vessel relating to the actual transportation or off-loading of petroleum products hold a valid tankerman's certificate issued by the United States Coast Guard and endorsed for the grade of product being transported or off-loaded.

8. That defendants require the person in charge of any tank vessel being off-loaded of any petroleum product to complete, as close in time to the actual off-loading as is practicable, a written check list certifying compliance with the applicable provisions of Paragraphs 1, 2 3 and 4 of this order; that defendants

inspect all such completed check lists periodically; and that bimonthly during the shipping season defendants report in writing to the Environmental Protection Agency their compliance with these paragraphs, and if not in compliance the reason[s] which might justify such non-compliance.