**UNITED STATES of America, Plaintiff-Appellant,**

v.

**DIXIE CARRIERS, INC., and Water Quality Insurance Syndicate, in personam and M/V Dixie Buccaneer and T/B ABC 2311, in rem, Defendants-Appellees.**

No. 79–3043.

United States Court of Appeals, Fifth Circuit.

Oct. 10, 1980.

Allen van Emmerik, Torts Branch, Civil Div., Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Frederick William Bradley, New Orleans, La., for defendants-appellees.

Before THORNBERRY, ANDERSON and THOMAS A. CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

This interlocutory appeal from partial summary judgment for the defendants in a suit brought by the government to recover oil spill cleanup costs presents a single issue: whether the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1321(f)(1), prevents the government from recovering its oil spill cleanup costs under additional legal theories. Because we conclude that Congress intended for the Federal Water Pollution Control Act (FWPCA) to provide the exclusive legal remedy for the government to recover its oil spill cleanup costs, we affirm the decision of the district court.

On June 22, 1974, a tugboat operated by appellee Dixie Carriers, Inc., lost control of its tanker barges in tow. One barge struck the Huey P. Long Bridge near New Orleans and discharged about 1,265,000 gallons of oil into the Mississippi River. After notifying the appropriate authorities, Dixie arranged for cleanup operations to commence. Dixie discontinued the cleanup operation when its cleanup expenses totalled $121,000, Dixie's maximum liability, calculated at $100 per ton of the barge, under section 1321(f)(1) as then in effect. The government contracted for cleaning up the remaining oil at a cost of over $954,400.

In July 1977 the government sued Dixie to recover the amount of its cleanup costs under section 1321(f)(1), and also under the Refuse Act, 33 U.S.C. § 407, and under common law theories of public nuisance and maritime tort for negligence. Dixie moved for partial summary judgment on the ground that the FWPCA provides the exclusive remedy for the government's claim, and forecloses actions based on other legal theories. The judge granted partial summary judgment to Dixie, and this interlocutory appeal under 28 U.S.C. § 1292(b) followed because the order below involves a controlling question of law as to which there is substantial ground for difference of opinion, and this appeal will materially advance the ultimate termination of this litigation. The district court did not decide, and we do not consider, whether Dixie's voluntary payments toward cleaning up the oil spill should be credited against its liability to the government for at least a portion of the government's cleanup costs. *See* 462 F.Supp. 1126, 1127 n. 1. Neither did the district court decide whether Dixie acted willfully to cause the oil discharge in this case. *See* 462 F.Supp. at 1128.

On appeal the government contends that it should be allowed to recover under additional legal theories because the FWPCA does not expressly repeal the Refuse Act nor supersede common law remedies. The government asserts that additional recoveries under the Refuse Act or common law would be consistent with the general policy of the FWPCA to prevent discharges of oil upon the navigable waters of the United States. 33 U.S.C. § 1321(b)(1).

Dixie contends that the language, legislative history, and general statutory scheme of the FWPCA demonstrate Congress' intent to provide an exclusive and comprehensive remedy for the government to clean up oil spills and to recover cleanup expenses. Because the FWPCA allows the government to recover only a limited amount under strict liability, and to recover an unlimited amount only upon proof of a willful discharge, Dixie asserts that the FWPCA embodies a balanced compromise which will be destroyed if the courts now allow the government to recover an unlimited amount under the Refuse Act or common law.

Every court that has considered this issue has held that the FWPCA provides the government's exclusive remedy for recovering oil spill cleanup costs. *See Steuart Transportation Co. v. Allied Towing Corp.,* 596 F.2d 609, 614–18 (4th Cir. 1979); *United States v. Tug J. P. McAllister,* Civ. No. 76–462 (D.P.R. Apr. 3, 1980); *United States v. Hollywood Marine, Inc.,* No. 77–1870 (S.D.Tex. May 3, 1979); *United States v. Hollywood Marine, Inc.,* 487 F.Supp. 1211 (S.D.Tex.1979), *reversed,* 625 F.2d 524 (5th Cir. 1980); *United States v. M/V Big Sam,* 480 F.Supp. 290 (E.D.La.1979), *vacating* 454 F.Supp. 1144 (E.D.La.1978); *In re Oswego Barge Corp.,* 1979 A.M.C. 333 (N.D.N.Y. 1978); *Valley Towing Service, Inc. v. S. S. American Wheat,* Civ. No. 75–363 (E.D.La. Dec. 19, 1978). *See also Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1162 (2d Cir. 1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979) (dicta). *But see* Comment, *Oil Spills and Cleanup Bills: Federal Recovery of Oil Spills Cleanup Costs,* 93 Harv.L.Rev. 1761 (1980) (suggesting that FWPCA should exclude Refuse Act recovery, but not recovery under maritime tort or public nuisance).

The FWPCA is in part a modification and reenactment of the Water Quality Improvement Act of 1970 (WQIA), Pub.L. No. 91–224, 84 Stat. 91, *amended and recodified at* 33 U.S.C. §§ 1251–1376. When Congress passed the WQIA in 1970, the government had no effective remedy for recovering cleanup costs from oil spills on navigable waters. The government had possessed no remedy at all until 1966, when Congress amended the Oil Pollution Act of 1924, ch. 316, 43 Stat. 604, to provide that the government could obtain a recovery, but only for grossly negligent or willful discharges. Act of Nov. 3, 1966, Pub.L.No. 89–753, § 211(a), 80 Stat. 1246, 1253. In section 108 of the WQIA Congress expressly repealed the Oil Pollution Act.

The government argues that Congress' failure to use similar express language to repeal any right of the government to recover under the Refuse Act or common law indicates Congress' intent to preserve these additional remedies for the government. We do not attach such significance to Congress' failure to repeal these remedies because at the time the WQIA and FWPCA were enacted—as at the time of our decision today—the government had never recovered oil spill cleanup costs under either the Refuse Act or common law. Congress' failure to repeal the Refuse Act provides especially weak evidence for the government because, unlike the Oil Pollution Act, the Refuse Act does not even provide the government with a cause of action to recover its cleanup costs. The Refuse Act imposes only fines up to $2500 and possible imprisonment for persons who discharge refuse upon navigable waters without permission of the Secretary of the Army. 33 U.S.C. § 411. No court has found an implied cause of action under the Refuse Act for the recovery of oil spill cleanup costs by the government.

Because the Oil Pollution Act did not provide an effective means for the government to recover its oil spill cleanup costs,

Congress enacted section 1321(f)(1), which, as in effect at the time of the spill in this case, provided in pertinent part that the

> owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred . . . for the removal of such oil or substance by the United States Government in an amount not to exceed $100 per gross ton of such vessel or $14,000,000 whichever is lesser, except that where the United States can show . . . willful negligence or willful misconduct . . ., such owner or operator shall be liable to the United States Government for the full amount of such costs.

■ We note initially that the phrase "notwithstanding any other provision of law" can be interpreted to mean that the remedial scheme provided in section 1321(f)(1) is exclusive. *See Tug Ocean Prince, Inc. v. United States*, 584 F.2d at 1162; *In re Oswego Barge Corp.*, 1979 A.M.C. at 337–39 (by implication). The government would interpret this phrase to mean only that the limitation of liability provision in the statute should not be further limited by other laws, such as the Limitation of Liability Act of 1851, 46 U.S.C. §§ 181–188, which would limit the vessel owner's liability for most tort claims to the value of the vessel after the accident and its freight then pending. The government's interpretation of the phrase receives some support from a committee report which remarks that section 1321(f)(1)'s "limitation on liability is intended to be the only limitation on liability for discharge of oil or matter under this section, notwithstanding any other provisions of law." H.R. Rep. No. 91–127, 91st Cong., 1st Sess. 11 (1969), *reprinted in* [1970] U.S. Code Cong. & Admin. News, pp. 2691, 2702. Because the phrase "notwithstanding any other provision of law" supports at least two conflicting interpretations, this language alone cannot resolve the controversy about whether the statutory remedy is exclusive.

*See Steuart Transportation Co. v. Allied Towing Corp.*, 596 F.2d at 615.

■ Although the express language of the statute provides little guidance to indicate Congress' intent, the structure of the remedies in section 1321(f)(1) suggests that Congress intended for those statutory remedies to be exclusive. The statute allows the government to recover only a limited amount of its cleanup costs under a strict liability theory. The government can then obtain additional, unlimited recovery of its cleanup costs only if it can prove willful negligence or willful misconduct with regard to the discharge.

Congress' intent to achieve a balanced and comprehensive remedial scheme in section 1321(f)(1) by matching limited recovery with strict liability and unlimited recovery with proof of willful conduct is apparent from the legislative history. The original Senate bill allowed the government an unlimited recovery upon proof of simple negligence. S. Rep. No. 91–351, 91st Cong., 1st Sess. (1969). The House of Representatives bill limited the government's recovery even upon proof of a willful discharge. H.R. Rep. No. 91–127, 91st Cong., 1st Sess. (1969), *reprinted in* [1970] U.S. Code Cong. & Admin. News, p. 2691. The final statute allowing only limited recovery under a strict liability theory and allowing an unlimited recovery only upon proof of willful conduct represents a compromise between the two proposed statutes. *See* H.R. Conf. Rep. No. 91–940, 91st Cong., 1st Sess. 30–39 (1969), *reprinted in* [1970] U.S. Code Cong. & Admin. News, pp. 2712–28.

In enacting a compromise bill that limits the government's recovery for cleanup costs in all cases except those involving willful discharges, Congress apparently intended to deter oil spills and recover cleanup costs in a manner that would protect most vessel owners from potentially crushing liability. For example, Congressman Cramer explained the compromise bill as follows:

> As the Members of this body will recall, the position of this body was that limitations of liability and imposition of liabili-

ty should not be such as to preclude the possibility of recovery of cleanup costs from the discharger. We felt that the gauge of this liability should be whether or not insurance could be obtained to cover these events. Consequently, the House bill provided for limitations of liability for vessels based upon an evaluation of the world insurance market for this new type of risk. The Senate position was based upon figures for which we could find no substantiation in their hearings and which we were assured were completely uninsurable.

\* \* \* \* \* \*

The conference was able to work out a compromise accepting the best features of both the House and the Senate positions. We arrived at a limitation of liability based on what we call strict liability. That is, regardless of fault and with certain very limited exceptions the discharger of oil will be liable. His limitation of liability would be $100 per gross ton or $14 million, whichever is higher [sic]. This figure incidentally is twice the amount paid in the *Torrey Canyon* case. In the case of cleanup necessitated as a result of a *willful* spill or of a *negligent* spill, the benefits of limitations of liability would be removed and where the privity and knowledge of the owner of the vessel was involved he would be required to pay the full costs for cleanup.

116 Cong. Rec. 9327 (1970). *See also* 115 Cong. Rec. 9020 (1969) (remarks of Rep. Cramer) (supporting liability ceiling in original House bill); 115 Cong. Rec. 9025 (1969) (remarks of Rep. Wright) (same). In the Senate, Senator Muskie observed that the limitation on liability was "an amount suggested by insurers as the insurable limit for this particular type of liability." 116 Cong. Rec. 8982–83 (1970). Senator Cooper referred to the limitation on liability section as "an important provision, which I consider draws a proper balance between the public interest and the ability of private enterprise to respond. I think it should be pointed out that the provision was adopted only after the most careful consideration and thor-

ough study." 116 Cong. Rec. 9003–04 (1970). *See also* 115 Cong. Rec. 28,958 (1969) (remarks of Sen. Spong) ("Our objective was to protect the taxpayers from potential cleanup costs, without imposing liability in excess of reasonable risks.").

The other provisions of the FWPCA are consistent with Congress' apparent intention to create a balanced and comprehensive remedial scheme that precludes recovery by the government under additional legal theories. Section 1321(p) assures that each vessel transporting oil can satisfy its limited liability by requiring each such vessel to show proof of insurance, bonding, or other financial ability in an amount equal to its limited liability level. In 1977 Congress increased the limited liability level from $100 per gross ton to $125 per gross ton to reflect the increasing costs of oil spill cleanups in the seven years after passage of the original Act. Clean Water Act of 1977, Pub. L. No. 95–217, § 58(d)(2), 91 Stat. 1566, 1595. Section 1371(a)(1) expressly prevents government actions to recover under legal theories inconsistent with the FWPCA: "This chapter shall not be construed as . . . limiting the authority or functions of any officer or agency of the United States under any other law or regulation not inconsistent with this chapter . . . ." Additional recovery by the government under the Refuse Act or common law would be inconsistent with the scheme in section 1321(f)(1) to match limited recovery with strict liability, and to allow additional recovery only upon proof of willful conduct.

■ Even though the Refuse Act is not repealed by the FWPCA, recovery of cleanup costs under this Act would be sharply inconsistent with section 1321(f)(1). The statutory section that retains the Refuse Act does not mention the recovery of cleanup costs, and is not at all inconsistent with section 1321(f)(1); section 1371(a)(2)(B) provides that the FWPCA "shall not be construed as . . . affecting or impairing the authority of the Secretary of the Army . . . under the Act of March 3, 1899 [the Rivers & Harbors Appropriation Act, which includes the Refuse Act]." The

Refuse Act gives the Secretary of the Army express control over various activities within navigable waters, but a claim for recovery of oil spill cleanup costs would be brought only as an implied cause of action by the Justice Department, not by the Secretary of the Army. Moreover, the Refuse Act is violated merely by the discharge of oil into navigable water without the permission of the Secretary of the Army. An implied cause of action for additional recovery under the Refuse Act would provide the government with unlimited recovery under an essentially strict liability theory. This result would be directly contrary to section 1321(f)(1), which allows only limited recovery for strict liability. Because of this conflict, we conclude that the FWPCA prevents the government from obtaining an additional recovery for oil spill cleanup costs under the Refuse Act. *See In re Oswego Barge Corp.*, 1979 A.M.C. at 337–39; Comment, 93 Harv.L.Rev. at 1778.

Allowing the government an additional recovery upon a showing of mere negligence or public nuisance under common law maritime tort and nuisance theories would also be inconsistent with the FWPCA. The careful matching of limited recovery with strict liability and unlimited recovery with proof of willful conduct in section 1321(f)(1) would be destroyed if the government could obtain an unlimited recovery upon a showing of mere negligence or nuisance. FWPCA provisions such as section 1321(p) that assures the government of the discharging vessel's financial responsibility and that makes the government the sole beneficiary of the assets recovered under the FWPCA do not indicate that Congress intended to allow additional recovery under common law theories merely because the common law does not provide the government with such special benefits. *Contrast* Comment, Harv.L.Rev. at 1777.

The government's contention that Congress intended for the limited liability provision to provide only a minimum insurance level, above which the government could obtain, but would not be guaranteed, unlimited recovery is contrary to the language of section 1321(f)(1). This section does not

employ "minimum insurance" terms, and it restricts recovery beyond the limited liability level only to cases involving willful conduct. Moreover, a Senate bill providing for such a "minimum insurance" plan was rejected by the conference committee. *See* S. Rep. No. 91–351, 91st Cong., 1st Sess. 17–18 (1969).

The government contends that the following remarks by Representative Dingell indicate that the FWPCA allows recovery under additional theories:

The Coast Guard should (a) vigorously enforce the Refuse Act of 1899 and the civil penalty provisions of the Water Quality Improvements Act of 1970 against all persons who unlawfully discharge oil into the Nation's waterways, and (b) utilize against unlawful oil dischargers other remedies such as suits under the Federal common law of public nuisance, or for reimbursement of clean up costs, or for damages.

118 Cong. Rec. 33757 (1972). The government's interpretation of these remarks is without merit. Representative Dingell was discussing only the civil penalty provisions in section 1321(b)(6), not the cleanup recovery provisions in section 1321(f)(1). Moreover, these particular remarks were quoted in full by Representative Dingell from the report of the House Committee on Government Operations, H.R. Rep. No. 92–1401, 92d Cong., 2d Sess. 33 (1972). Like Representative Dingell, the committee was concerned only with the enforcement of the penalty provisions of the Refuse Act and WQIA. The context of the passage shows that the committee's statement about the common law of public nuisance refers only to injunctive relief, as allowed in *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), and in *United States v. Ira S. Bushey & Sons, Inc.*, 363 F.Supp. 110 (D.Vt.), *aff'd mem.*, 487 F.2d 1393 (2d Cir. 1973), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3182, 41 L.Ed.2d 1146 (1974), which cases the committee discusses on the page previous to the quoted passage. The statement about reimbursement of cleanup costs refers only to section 1321(f)(1), whose

maximum liability requirements the committee recognizes in the paragraph previous to the quoted passage. The statement about recovery for damages, as opposed to general cleanup costs, is consistent with section 1321(*o*)(1), which expressly allows the government to recover for property damages actually suffered from an oil spill. Neither the committee report nor Representative Dingell's quotation from the report can be meaningfully interpreted as a statement that the FWPCA allows the government to recover cleanup costs under additional legal theories.

In addition to the scheme for government recovery of cleanup costs in section 1321(f)(1), Congress expressly allows some other specific remedies in the event of oil spills. Section 1321(*o*)(1) states that the FWPCA should not affect or modify the remedies of any private or public party, including the government, to recover for actual damage to property from an oil spill. Section 1321(*o*)(2) states that the FWPCA does not preempt a state from imposing separate liability for oil spills on water within its borders. *See Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973) (FWPCA) does not preempt state strict liability for oil spills). Section 1321(h)(2) states that the FWPCA does not affect the rights which the United States may have against a third party whose actions caused an oil spill. *See United States v. LeBeouf Brothers Towing Co.*, 621 F.2d 787 (5th Cir. 1980) (third party defense under section 1321(f)(1) for oil spill from barge does not extend to tug towing barge at time of spill). No such express language allows the government to recover its cleanup costs under the Refuse Act or common law.

In the absence of a clearer indication from Congress that the government may obtain recovery under additional theories, we conclude that the balanced and comprehensive scheme in section 1321(f)(1) provides the exclusive remedy for the government to recover its cleanup costs from oil spills. We recognize that additional recoveries may be necessary to deter and to clean up harmful oil spills, but we believe that this expanded remedy must be provided by Congress, not by this court. For these reasons, the judgment in the court below is affirmed.

AFFIRMED.