**UNITED STATES of America, Plaintiff,**

v.

**DIXIE CARRIERS, INC. Water Quality Insurance Syndicate, in personam M/V Dixie Buccaneer T/B ABC 2311, in rem, Defendants.**

Civ. A. No. 77-2090.

United States District Court,
E.D. Louisiana.

April 4, 1983.

Allen van Emmerik, Washington, D.C., for plaintiff.

Bigham, Englar, Jones & Houston, New York City, Machale A. Miller, New Orleans, La., for defendant Water Quality Ins. Syndicate.

Donald A. Abaunza, New Orleans, La., for defendant Dixie Carriers, Inc.

MEMORANDUM OPINION

CASSIBRY, District Judge:

The issue presently before the Court is the amount of recovery by the United States against the Barge ABC–2311, its owner Dixie Carriers, Inc., and Dixie Carriers' insurer, the Water Quality Insurance Syndicate (WQIS), under the Federal Water Pollution Control Act of 1972 (FWPCA), 33 U.S.C. § 1321(f), for the United States' oil pollution cleanup costs resulting from an oil spill on June 22, 1974. Previously the court decided that the FWPCA was the sole and exclusive remedy for the United States' recovery of its cleanup costs, reserving for later determination the amount of that recovery. *United States v. Dixie Carriers, Inc.*, 462 F.Supp. 1126 (1979), aff'd 627 F.2d 736 (5th Cir.1980). By agreement of the parties the matter of quantum of recovery was submitted without trial on a stipulation of facts and deposition testimony.

On June 22, 1974 the Barge ABC–2311, laden with a cargo of crude oil and being towed in the Mississippi River by the M/V DIXIE BUCCANEER, owned and operated by Dixie Carriers, Inc., [Dixie], drifted against a bridge pier of the Huey P. Long Bridge, located near New Orleans, Louisiana, and began leaking crude oil into the river at a rate of 30–50 gallons per minute. The total spillage was 1,008,000 gallons.

Dixie notified the United States Coast Guard of the spill and began cleanup operations, using the services of two contractors—Oil Mop, Inc., and Peterson Maritime Services, Inc. After approximately $131,705 in cleanup services had been rendered to Dixie by the two contractors, Dixie discontinued cleanup operations on June 24, 1974. Dixie paid Peterson Maritime Services, Inc., $13,465.86, and paid Oil Mop, Inc., $95,000.00 as a compromise of its invoice for $118,240.92. WQIS provided the $95,000.00 to Dixie for the payment to Oil Mop, Inc. After Dixie discontinued cleanup operations, the United States cleaned up the remainder of the oil spill at a cost of $945,043.53.

The United States contends that it is entitled to recover $121,600 of its cleanup costs from the defendants in accordance with the provisions of 33 U.S.C. § 1321(f)(1). The amount of its cleanup costs that the United States may recover from the spiller is limited by the provision of 33 U.S.C. § 1321(f)(1) to $100 per gross ton of the barge. The Barge ABC–2311 represents 1,216 gross tons.[1] The defendants contend that the expenses incurred by Dixie in promptly initiating cleanup should be credited against the liability imposed by § 1321(f)(1) and their liability to the United States should be reduced by the $108,456.86 Dixie paid the independent contractors to $13,134.14.

The United States relies on the wording of 33 U.S.C. § 1321(f)(1) as the expression of Congress which clearly does not permit a limit of the recovery by the United States of its cleanup costs by crediting against that recovery the voluntary cleanup costs of the one responsible for the spill.[2] It points out that the subsection addresses only the liability *"to the United States Government for the actual costs ... for the removal of*

such oil ... *by the United States Government* in an amount not to exceed $100 per gross ton," and the FWPCA contains no provision for a credit to the owner or operator responsible for the spill for voluntary cleanup costs.

The defendants suggest that the meaning of the word "by" in the phrase "actual costs ... *by the United States"* should be extended and enlarged to mean "on behalf of", and that voluntary cleanup costs should be regarded as costs incurred indirectly "on behalf of" the United States. The defendants contend that this construction of the FWPCA should be made to allow the credit because

(1) Denying Dixie a credit for the costs it has incurred would frustrate the avowed legislative purpose of encouraging a spiller to initiate immediate cleanup response thereby preventing or minimizing environmental damage and reducing cleanup costs;

(2) Denial of the credit produces the anomalous result that an indifferent spiller who does not promptly undertake cleanup is held to a lower degree of financial responsibility than a conscientious one;

1. The FWPCA was enacted in 1948, and was found in 33 U.S.C. § 466. The statute since has been amended a number of times. The first amendment occurred in 1970 in the form of the Water Quality Improvement Act (84 Stat. 91), which, among other things, added as Section 11 a new provision for the "Control of Pollution By Oil." Section 11 of the FWPCA is now found in 33 U.S.C. § 1321, the section of the statute which controls this litigation. The statute was further amended in 1972 by the Federal Water Pollution Control Act Amendments of 1972 (86 Stat. 816), which amendments did not materially alter those provisions of the FWPCA pertinent to the instant litigation. A further amendment occurred in the form of the Clean Water Act of 1977 (91 Stat. 1566), which, among other things, raised the tonnage limitation in subsection (f) from $100 to $125 per gross ton for an inland oil barge. This amendment became effective after the incident involved in this litigation so that the $100/gross ton limitation applies herein.

2. 33 U.S.C. § 1321(f)(1) provides in pertinent part:

Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a

third party ... such owner or operator of any vessel from which oil ... is discharged in violation of subsection (b)(3) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil ... by the United States Government in an amount not to exceed $100 per gross ton of such vessel, ... except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs....

Subsection (i)(1) permits the owner or operator to bring a suit against the United States Government in the United States Court of Claims to prove a claim that the owner or operator removed oil which was caused to be discharged by causes enumerated in (A), (B), (C), or (D). The defendants do not contend that the oil in this case was discharged by any of those causes, and the United States has abandoned its claim that the discharge was caused by willful negligence or misconduct of Dixie.

(3) Logically the spiller should be able to satisfy its subsection (f) obligation by promptly cleaning up and paying the cleanup contractors directly, rather than waiting for the government to contract for and pay the contractors;

(4) Denial of the credit upsets the legislative compromise reflected in the FWPCA amendments.

The defendants further contend that they are entitled to the credit because

(1) 33 U.S.C. § 1321(d) grants the spiller a credit for cleanup costs it incurs whenever the Coast Guard coordinates, monitors and supervises the cleanup;

(2) The government, by directing Dixie to cleanup and receiving the benefits thereof, is estopped to deny a credit;

(3) Dixie acted as the government's agent in retaining the services of the cleanup contractors, and, as such is entitled to a credit for the cleanup expenses because they were incurred for the principal's (the government's) benefit.

I.

To support their contention that the FWPCA should be construed to allow the credit the defendants rely on two rules of statutory construction:

(1) A statute should be construed in a manner that promotes the legislative purpose and accomplishes the legislative goals for which it was enacted;

(2) A statute should not be afforded a construction which produces nugatory results.[3]

The argument is made that one of the primary purposes of the 1970 FWPCA Amendments as revealed by the legislative history surrounding them was to mollify the effects of an oil spill by encouraging the spiller to act promptly to remove the substance thereby lessening the harmful impact of the spill, and that to deny the credit would frustrate this purpose. Additionally it is argued that permitting the spiller to satisfy its subsection (f) obligation by promptly cleaning up and paying the cleanup contractors directly, rather than by reimbursing the government after the latter has cleaned up the spill, will serve to ensure prompt remedial measures by the spiller. The opposite interpretation, insist the defendants, would result in holding an indifferent polluter who makes no cleanup effort to a lesser degree of financial responsibility than the conscientious spiller who acts promptly to minimize the spill's consequences.

The legislative history of the 1970 Amendments, Water Quality Improvement Act of 1970, Pub.L. No. 91–224, 84 Stat. 91 (1970), shows that the House of Representatives and the Senate expected the spiller to clean up his own spill, and there is nothing to indicate that the Congress contemplated that the only financial obligation of the spiller is that stated in subsection (f)(1) when the government incurs cleanup costs. The Act was passed after a conference committee considered H.B. 4148 and Senate 7, 91st Cong., 1st Sess. (1969).

Subsection 17(e)(1) of H.R. 4148 *required* that the owner or operator of the vessel immediately remove any oil discharge. If it failed to do so, the United States could perform the cleanup, and the owner or operator and vessel would be liable for up to $10 million of the cleanup cost, or a sum equal to $100 per gross ton of the vessel, whichever was less. Section 12(e) of S. 7 provided that, unless the owner or operator undertook removal of the oil discharge immediately, the President should remove or arrange for the removal. If the President removed the oil discharge, the owner or operator would be liable for the removal costs in an amount not to exceed $125 per gross ton of the vessel, or $14 million, whichever was the lesser.

---

**3.** The defendants have presented selective quotations from several decisions to illustrate the ways these rules have been articulated by the courts, for example:

> [A court] should attempt to effectuate the purpose of federal legislation and avoid interpretations which produce absurd or nugatory results. *In Re United States,* 563 F.2d 637, 642 (4th Cir.1977).

Senate Report 351, 91st Cong., 1st Sess. (1969), on S. 7 explained that Section 12(e) would require that oil discharged contrary to regulations be removed immediately. "The object of this provision is to make the discharger completely responsible for cleaning up the discharged oil and preventing or lessening potential damage .... if the discharger fails or is unable to act to remove the oil ... the President may take appropriate measures to remove the oil ..." S.Rep. 351, at p. 67.

The conference substitute for the two bills added a new Section 11 to the FWPCA. Subsection (c)(1) provided:

Whenever any oil is discharged, into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, the President is authorized to act to remove or arrange for the removal of such oil at any time, unless he determines such removal will be done properly by the owner or operator of the vessel ... from which the discharge occurs.

In Conference Report 940, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S. Code and Ad.News, 91st Cong., 2d Sess., 2691, at 2723, this provision is explained:

Paragraph (1) of subsection (c) authorizes the President to act to remove or arrange for the removal of any oil discharged into the navigable waters.... If he determines the removal will be properly done by the owner or operator of the vessel ... from which the discharge occurs, he may permit them to do so. The conferees wish to make it clear that the basic responsibility for necessary cleaning up in these situations is placed upon the President. This is not to be construed to inhibit or prevent any owner or operator from undertaking whatever action is necessary to contain or remove an oil discharge.

The defendants illustrate the legislative intent to encourage the spiller to clean up its spill with a statement from Representative Boggs:

There is one important point I should like to add in relation to the oil cleanup liability section of the bill. The emphasis in this section is on the "cleanup", not "liability". It is the intent of this legislation, and I cannot stress this point too strongly, that the polluter should clean up any oil spill on his own, and that the Government should not need to act. The Government should take action only when the polluter fails himself to take prompt, effective action. This is a responsible approach, fitting the sense of public responsibility held by the vast majority of American Businessmen. 115 Cong.Rec. 28957 (1969).[4]

They point out also that the matter of encouragement to the spiller is addressed in the National Oil and Hazardous Substances Pollution Plan, formulated by the Council on Environmental Quality, appointed by the President to carry out the mandate of subsection (c) of the FWPCA. "The OSC [On-Scene Coordinator as defined in 40 C.F.R. § 1511.5(c)] should, if practicable, insure that the person responsible for the discharge is aware of his responsibility *and is encouraged to undertake necessary countermeasures.*" (emphasis supplied). 40 C.F.R. § 1510.21(b).

The essence of defendants' argument on construction of the statute is that the Congress failed to provide the incentive for the spiller to act promptly to clean up the spill, and the judiciary should supply that incentive by interpreting the statute to allow the credit, thus effectuating the purpose of the statute to encourage prompt cleanup by the spiller. The failure of the FWPCA to provide the incentive necessary to encourage a spiller to clean up his own spill has been

---

**4.** If the polluter follows the intent that he should take the responsible approach, clean up any oil spill on his own, and that the Government should not need to act, the result is that the polluter will bear the entire financial responsibility unless he can prove that he comes within (A), (B), (C) or (D) of subsection (f)(1) to

noted as one of its weaknesses.[5] Incentive proposals have been before Congress and its committees in other pollution legislation.

To one of the bills introduced in 1969 to amend the Oil Pollution Act, 1924, H.R. 6495, 91st Cong., 1st Sess., the United States Coast Guard proposed a substitute bill to require in Section 4(b) that the negligent spiller (and one guilty of misconduct) immediately remove the oil. Upon his failure to act the President could perform the cleanup, and the negligent spiller would be liable for up to $100 per gross ton of the vessel involved, but not more than $10 million. The credit contended for here was proposed by the Coast Guard in Section 4(d) of its substitute in this language:

> "The total liability to the United States shall be reduced by whatever amount such owner or operator shall have expended, in carrying out his obligation under subsection (b) of this section, prior to initiation of Federal removal action...."

H.R. 6495 was not enacted into law. Neither H.R. 4148 nor S. 7 which were enacted after conference by the 91st Congress as amendments to the FWPCA mentioned such a credit.

The House of Representatives addressed the incentive need in H.R. 85, the "Oil Pollution Liability and Compensation Act," 96th Cong., 1st Sess. (1979). H.R. 85 provided for a $200 million trust fund to pay for oil spill cleanup and removal costs, the fund to be derived from a fee, or tax on each barrel of oil refined, or received at a terminal, within the United States. "Removal costs" were a recoverable economic loss against the fund, but a spiller's claim was reduced to his excess costs, those above his liability under the act.

The report of the Committee on Merchant Marine and Fisheries, one of the committees to whom the bill was referred, explained that

> "The purpose of this provision in relation to owners and operators is two-fold. First, it removes any disincentive that the owner may have in undertaking the cleanup, based on the liability issue; and, secondly, it serves as an encouragement for him to continue his cleanup activities, even after his limitation of liability has been reached, by affording him a basis for compensation of the cost of cleanup in excess of his limitation ..."[6]

The limited liability of the spiller not guilty of willful misconduct or gross negligence was stated in Section 104 of H.R. 85 as follows:

> (b) ... the total of the liability ... *and any removal costs incurred by, or on behalf of, the owner or operator shall be limited to* —
>
> .    .    .    .    .
>
> (2) in the case of an inland oil barge, $150,000 or $150 per gross ton whichever is greater; ... (emphasis supplied).

The Committee Report explained that this provision was intended as an incentive.

> The amounts subject to limitation are the total of the liability ... and any removal costs incurred by or on behalf of the owner. The additional language referring to removal costs is included to make clear that, if an owner or operator spends money on removal costs for his own spill, that amount will be included as a part of the total liability to which he is subjected. This provision will provide an incentive for the owner or operator to immediately begin cleanup activities which should result in a reduction of other potential damages. H.R.Rep. No. 172, Pt. 1, supra, at p. 42, U.S.Code Cong. & Admin.News, p. 6187.

---

recover his costs in the Court of Claims under subsection (i)(1).

**5.** Helfrich, Problems in Pollution Response Liability under Federal Law: FWPCA Section 311 and the Superfund, 13 Jour. Maritime Law and Commerce, 455, 471 (1982).

**6.** H.R.Rep. No. 172, Pt. 1, p. 40, 96th Cong., 1st Sess. (1979) [reprinted in 1980 U.S.Cong. and Ad.News 6119, 6160, 6185].

H.R. 85 was passed by the House on September 19, 1980 [7] but was not enacted into law. Some of its concepts and provisions were included in Pub.L. No. 96–510, Comprehensive Environmental Response, Compensation and Liability Act of 1980, 94 Stat. 2767, 42 U.S.C. § 9601 et seq., but this incentive concept was not included. Pub.L. No. 96–510, a superfund concept, addressed the problem of hazardous substances releases, not including crude oil. Its incentive for prompt cleanup was the imposition of punitive damages up to three times the amount of any costs incurred by the Fund as a result of failure to provide removal action on order of the President.

The legislative history of the bills and laws discussed above shows that the Congress has been working on pollution problems created by oil spill and hazardous waste for years. These problems raise legal, social, political and economic questions involving competing interests of the spiller, the public and the government. The solutions for the problems are so complex that action by the courts to provide a solution, when the Congress has apparently failed to act, could in fact distort policy considerations by the Congress under the guise of statutory interpretation.

These considerations make caution advisable here, however desirable the incentive to encourage prompt cleanup may be made to appear. The defendants emphasize that this case demonstrates the financial advantage a spiller who chooses to do nothing can have over a spiller who undertakes partial cleanup, if the credit is not available. On the other hand, if the credit is available to the spiller who undertakes partial cleanup, the financial disadvantage of the spiller who responsibly performs a complete cleanup can be even greater. Moreover, supplying the credit which the defendants contend for obviously affects adversely the interest represented in the FWPCA that the United States should be reimbursed for its removal costs.

I have concluded that the Congress is better able to determine when and how the incentive for prompt cleanup by a spiller should be provided. I cannot supply the incentive by allowing the credit with any real conviction that such a decision would be serving the policy of the FWPCA.

## II.

The defendants contend that, since the United States directed the removal efforts in this case, subsection (d) of the FWPCA provides an alternate basis for allowing credit under subsection (f) for Dixie's voluntary cleanup costs.[8] The defendants recognize that this contention was made in *Steuart Transportation Company v. Allied Towing Corporation,* 596 F.2d 609, 618 (4th Cir.1979), and was rejected. That decision is correct. The subsection does not permit the interpretation that expenses of private removal efforts are to be considered as costs incurred by the United States Government under subsection (f). In addition to the reasons stated in that case the Conference Report No. 940, supra, prevents any such interpretation.

Subsection (d) provides authority for the United States to remove, and if necessary, to destroy vessels in cases where they pose a substantial threat of a pollution hazard through the discharge of oil.

---

7. 126 Cong.Rec. H9,208 (daily ed. Sept. 19, 1980).

8. (d) Whenever a marine disaster in or upon the navigable waters of the United States has created a substantial threat of a pollution hazard to the public health or welfare of the United States, including, but not limited to, fish, shellfish, and wildlife and the public and private shorelines and beaches of the United States, because of a discharge, or an imminent discharge, of large quantities of oil from a vessel the United States may (A) coordinate and direct all public and private efforts directed at the removal or elimination of such threat; and (B) summarily remove, and, if necessary, destroy such vessel by whatever means are available without regard to any provision of law governing the employment of personnel or the expenditure of appropriated funds. Any expense incurred under this subsection shall be a cost incurred by the United States Government for the purposes of subsection (f) in the removal of oil.

Pub.L. No. 91–224, § 11(d); 33 U.S.C. § 1321(d).

This is almost identical to the equivalent provision in the House Bill with the exception that in lieu of the House provision making the expense of removal a charge of the vessel, its cargo and owner and permitting the sale thereof, there had been substituted a provision from the Senate amendment which states that the expense incurred under this subsection will be deemed to be a cost incurred by the United States in the removal of "oil for the purposes of liability under subsection (f) of this section."

1970 U.S.Cong. and Ad.News 2724.

The subsection as drafted is not free of ambiguity, but the report demonstrates that the "expense incurred" refers to the expense of the United States for the removal of a vessel, and not to the costs of private removal efforts.

### III.

The defendants seek the credit also under the doctrine of equitable estoppel. They contend that the actions of the United States in encouraging Dixie to initiate cleanup which was detrimental to its interests estops it from denying the credit. A serious injustice results they insist if, after Dixie conscientiously complied with the Coast Guard's demands, they fare worse than they would if Dixie had acted indifferently and done nothing. To show how the Coast Guard encouraged the cleanup efforts of Dixie they rely on a telex forwarded to Dixie on the evening of June 22, 1974,[9] on the fact that the Coast Guard orally directed Dixie to clean up, and on the fact that the Coast Guard through its representative coordinated cleanup efforts.

These actions, according to the defendants, cause the matter to fall squarely within the criteria of *United States v. Lazy FC Ranch,* 481 F.2d 985 (9th Cir.1973), for asserting estoppel as a defense against the government. The following language at p. 989 is relied on:

9. The telex reads in pertinent part:
You are advised that under the provisions of the Federal Pollution Control Act you are responsible to remove from the water of the United States any oil spilled. The Coast

The *Moser-Brandt-Schuster* [*Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951); *Brandt v. Hickel,* 427 F.2d 53 (9th Cir.1970); *Schuster v. C.I.R.,* 312 F.2d 311 (9th Cir.1962) ] line of cases establish the proposition that estoppel is available as a defense against the government if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel. This proposition is true even if the government is acting in a capacity that has traditionally been described as sovereign (as distinguished from proprietary) although we may be more reluctant to estop the government when it is acting in this capacity . . . .

The weakness of the defendants' arguments stems from the difficulty of depicting the Coast Guard's actions as "wrongful conduct". To the extent that a spiller is regarded as having a responsibility to clean up his own spill, encouraging that responsibility is not wrongful. The responsible approach, as expressed by Representative Boggs, supra, was for Dixie to clean up the entire spill, without any removal action by the government. The language of 33 U.S.C. § 1321(c)(1) is a recognition of that responsibility:

. . . the President is authorized to act to remove or arrange for the removal of such oil or substance at any time, unless he determines such removal will be done properly by the owner or operator of the vessel, . . . from which the discharge occurs.

The facts of this case do not come within the doctrine of equitable estoppel.

### IV.

The defendants urge as an additional ground for being entitled to the credit that Dixie was an agent of the Coast Guard

Guard will monitor cleanup operations to determine if they are adequate within the meaning of the Federal Water Pollution Control Act.

when it employed the two independent contractors to perform cleanup operations. Because the government had complete control over the operation in the sense that the Coast Guard representatives directed the cleanup crews to locations which needed cleaning up, the defendants contend that Dixie and the United States had an agency relationship which obligates the United States to reimburse them in the form of the credit for Dixie's expenses.[10]

The Coast Guard's actions here were no more than the action contemplated by 33 U.S.C. § 1321(d) which permits the United States "to coordinate and direct all public and private efforts directed at the removal" of a discharge of large quantities of oil which creates a substantial threat of pollution. There is nothing in the statute to indicate any intent that the private interests would become agents of the government under these circumstances. The ground urged lacks merit.

The Clerk shall enter judgment in favor of the United States in the amount of $121,-600.00.

**10.** Defendants rely on cases which recognize that one of the determinant factors in ascertaining whether an agency exists is control by the proposed principal. *Grant v. Bill Walker Pontiac-GMC, Inc.,* 523 F.2d 1301, 1305 (6th Cir.1975); *Smith v. Cities Service Oil Co.,* 346 F.2d 349, 352 (7th Cir.1965); *Arnson v. General Motors Corporation,* 377 F.Supp. 209 (N.D. Ohio 1974).