UNITED STATES of America,
Plaintiff-Appellee,

v.

DIXIE CARRIERS, INC., Water Quality Insurance Syndicate, M/V Dixie Buccaneer and T/B ABC 2311, In Rem, Defendants-Appellants.

No. 83–3321.

United States Court of Appeals,
Fifth Circuit.

July 12, 1984.

---

Montgomery, Barnett, Brown & Read, Henry J. Read, New Orleans, La., Thacher, Proffit & Wood, Sheldon A. Vogel, New York City, for Dixie Carriers and Water Quality.

Allen van Emmerik, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before RANDALL, TATE, and WIL-LIAMS, Circuit Judges.

TATE, Circuit Judge:

The defendants, Dixie Carriers, Inc., Water Quality Insurance Syndicate, M/V Dixie Buccaneer, and the T/B ABC-2311 (hereinafter singularly referred to as "Dixie Carriers") appeal from the grant of a money judgment in favor of the plaintiff, the United States, in the Government's suit to recover its pollution cleanup costs resulting from an oil spill from Dixie Carriers' barge. The issue presented by this appeal is whether the district court properly allowed the United States to recover against the defendant the full amount of the tonnage maximum permitted under the Federal Water Pollution Control Act, 33 U.S.C. § 1321(f) (hereinafter "the Act"), i.e., $121,600,[1] without first crediting to Dixie Carriers the costs incurred by it in its initial cleanup operations (i.e., some $108,000)[2]

---

**1.** Under § 1321(f)(1) the Government, with exceptions not relevant to this appeal, can recover its cleanup costs under a theory of strict liability from the vessel owner or operator up to specified dollar limits. 33 U.S.C. § 1321(f)(1) provides in pertinent part:

> Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, notwithstanding any other provision of law, be liable to the United States Government for the actual costs incurred under section (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed, in the case of an inland oil barge $125 per gross ton of such vessel, or $125,000, whichever is greater ...

For purposes of this litigation, the 1972 amendment to the Act (86 Stat. 816) that set the tonnage limitation at $100/gross ton is controlling. Dixie Carriers' barge was of 1,216 gross tonnage; thus, its tonnage limitation under the Act was $121,600.00.

**2.** Dixie Carriers initially expended $108,465.86 to clean up the spill. After Dixie discontinued

before the Government took over and completed the cleanup of the oil discharge. Finding that the provisions of the Act negate an intention to allow such credit, we affirm the denial.

The United States originally filed this suit urging various theories of recovery [3] and seeking judgment in the sum of $945,043.53, representing its entire costs in the cleanup operation. On the defendants' motion for partial summary judgment, the district court held, 462 F.Supp. 1126 (E.D.La. 1978), and this court affirmed, 627 F.2d 736 (5th Cir.1980), that § 1321(f) of the Act provides the government's exclusive remedy against Dixie Carriers.[4]

At the time the other claims of the government were dismissed by summary judgment, the question of whether Dixie Carriers' voluntary payment toward cleaning up the oil should be credited against its liability to the government was left open. *Dixie Carriers, supra,* 462 F.Supp. at 1127 n. 1. After this court's affirmance of the summary judgment dismissing claims on other theories against the government based, the credit issue was decided and is the subject of the present appeal.

The district court entered judgment against the defendants in the sum of $121,600.00, its statutory non-fault limited liability under § 1321(f) of the Act, plus legal interest and costs without allowing credit for its own cleanup expenditures.

On appeal, Dixie Carriers principally contends that it should have been allowed this credit of $108,465.86. Dixie Carriers contends that a credit is due, both A) because denial of the credit would frustrate the legislative purposes of the Federal Water Pollution Control Act (the statutory purpose contention), and B) because it relied to its detriment upon a Coast Guard telegram that allegedly advised it mistakenly that Dixie Carriers had a legal responsibility to remove the spill (the estoppel contention).

*Context Facts*

On Saturday, June 22, 1974, a barge, owned and operated by Dixie Carriers, drifted against a pier of the Huey P. Long Bridge while being towed up the Mississippi River near New Orleans, Louisiana. As a consequence, approximately 1,265,000 gallons of oil spilled from the barge into the river.

The manager of operations for Dixie Carriers, A. J. Morriz, testified at his deposition that he first learned of the accident from the Dixie Carriers' port captain, Milton DeRocha, on the afternoon of the accident. At that time, DeRocha suggested to Morriz that something be done to move the barge as soon as possible. A short time later, a representative of the Coast Guard contacted Morriz by telephone and informed him that the barge was leaking oil and that arrangements should be made to protect the water intakes and start cleaning up. Morriz testified that he then called a cleanup company to begin the cleanup operation.[5]

Additionally, the Coast Guard sent a telegram on June 22 to Dixie Carriers advising it that "under the provisions of the Federal Pollution Control Act" Dixie Carriers was responsible for removal of the oil. This telegram was apparently received some two days after the accident.[6]

---

cleanup operations, the United States spent an additional $945,043.53 to clean up the remainder of the spill.

3. The government originally sued the defendants under the Federal Water Pollution Control Act, 33 U.S.C. § 1321(f)(1), the Refuse Act, 33 U.S.C. § 401, and under common law theories of public nuisance and maritime tort for negligence. The court rejected these claims on the basis that the Act's remedy of the United States against the discharger was exclusive. *See United States v. Dixie Carriers,* 627 F.2d 736, 737 (5th Cir.1980).

4. Thus Dixie Carriers' maximum liability under § 1321(f) of the statute is $121,600.00. *See* note 2 *supra.*

5. Morriz further testified that Dixie Carriers generally does the cleanup work itself, but, depending on the situation, may call in a cleaning contractor to assist in the operation.

6. Although the telegram was transmitted on June 22, 1974, Morriz testified that because the accident occurred on a Saturday, it "was probably not until Monday of the next week [June 24,

On Monday, June 24, 1974, Dixie Carriers notified the Coast Guard that it was discontinuing its involvement in cleanup operations because the costs ($108,465.86) were approaching the tonnage limitation ($121,600.00) under 33 U.S.C. § 1321(f)(1). Following this notice, the government continued the operation, incurring an additional $954,403.53 in cleanup costs.

On appeal, as earlier noted, Dixie Carriers contends that the district court erred in failing to grant it a $108,465.86 credit toward the tonnage limitation of $121,600.00 for which under § 1321(f) it was held liable to the government, advancing both (A) statutory purpose and (B) estoppel arguments.

## A. The Statutory Purpose Contention

Dixie argues that the legislative purpose of the Federal Water Pollution Control Act is frustrated by the district court's holding and that, therefore, we should reverse the district court's construction that the Act evidences no legislative intention to permit a discharger to obtain credit, against its § 1321(f) liability to the government, for cleanup costs voluntarily assumed by it. The primary purposes of the Act are to "expedite oil pollution cleanup and to establish a workable scheme for limiting and distributing liability."[7] *Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1162 (2d Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). Dixie maintains that the district court's holding operates as a disincentive to pollutors to act immediately, since any funds expended in voluntary efforts to contain a spill would not be credited against the spiller's ultimate liability under the Act. Indeed, it is argued, the "conscientious spiller" who immediately spends money to minimize the spill's consequences would be effectively "punished", while the indifferent pollutor who does nothing but notify the

Coast Guard would be held to a lesser degree of financial responsibility.

We reject this contention, because, *first,* the statute does not provide for a credit, nor does the legislative history suggest that, as a policy matter, a credit was intended, and because, *second,* the allegedly "anomalous" results suggested by Dixie Carriers, i.e., that denial of a credit would prolong the cleanup process by discouraging spillers from taking any immediate steps, is not shown to be a persuasive reason to supply to a discharger a judicial remedy not contemplated by the statute itself.

*First,* § 1321(f) of the Act, which allows recovery of costs by the Government, addresses only the liability "*to* the United States Government for the actual costs ... for the removal of such oil ... *by* the United States Government in an amount not to exceed $100 per gross ton." No provision for a credit for voluntary cleanup is contained in this subsection. Nor does the legislative history of the Act support any reason to find that allowance of such a credit was legislatively contemplated.[8] *See* the excellent opinion of the district court, 560 F.Supp. 796 at 798–801, and our discussion below.

In the only previous circuit decision that addressed (and rejected) the credit contention advanced by the present discharger, *Steuart Transportation Company v. Allied Towing Corporation,* 596 F.2d 609 (4th Cir.1979), the owner of a discharger barge sought to offset the amount it had spent for oil removal costs against the amount for which it was liable to the United States under § 1321(f) of the Act. The Fourth Circuit concluded that § 1321 did not entitle the discharger to reimbursement. *Id.* at 619. The court reasoned that

---

1974] or two days later" that he first saw the telegram.

7. § 1321(b)(1) proclaims that "it is the policy of the United States that there be no discharges of oil into or upon the navigable waters of the United States...."

8. For instance, during the Congress at which § 1321(f)'s identical predecessor was enacted, the United States Coast Guard had proposed a substitute bill which *would* have included a credit for owner cleanup. H.R. 6495, 91st Cong., 1st Sess. (1969). The proposed bill was not enacted.

[t]his subsection requires the government to coordinate all public and private efforts to remove an oil spill caused by a marine disaster. The expense of these efforts is deemed "a cost incurred by the United States Government for the purposes of [§ 1321(f)]." This means that the United States can recover all costs incurred during the cleanup operation from the shipowner who is responsible for the spill, subject to the exceptions and limitations of § 1321(f)(1). It does not mean that the owner of the polluting vessel can recover any costs from the government.

*Id.*

The *Steuart* court further observed that any recovery by a discharger of cleanup costs from the United States that is allowable under the Act, is provided for solely by § 1321(i)(1) [9]. "This subsection allows a shipowner to recover costs only if it establishes that the discharge was due to one of the causes that would excuse the owner from all liability for federal removal expenses." 596 F.2d at 619. The Senate report concerning the reasons for the enactment of this provision is illuminating, both as to the issue of intended reimbursement, as well as to the legislative intent that a shipowner or operator would be expected to take action to contain his own discharge:

> If an oil spill occurs, the committee expects that the owner or operator will take such action as may be necessary, following notification to immediately clean up the discharge. If the owner or operator fails to do so and the United States is required to act, then the United States is authorized to collect its cost up to the limit of liability or, if the United States is able to prove that the discharge was the result of negligence or a willful act, all costs regardless of limit of liability. If the owner or operator cleans up an oil discharge and later is able to prove that the discharge was caused solely by (a) an act of God, (b) an act of war, (c) negligence on the part of the U.S. government, or (d) an act of a third party, he may recover reasonable cleanup costs from the United States in an action before the court of claims.

S.Rep. No. 91–351, 91st Cong., 1st Sess. 17–18 (1969).

If only as a matter of usual statutory construction, we conclude that § 1321(f)(1), read in light of § 1321(i)(1), precludes that a credit for cleanup costs voluntarily undertaken by a discharger was intended under the Act as allowable against the discharger's limited no-fault liability under (f) to the government for the latter's cleanup costs incurred by reason of the discharge (except for four narrowly drawn statutory reasons, none applicable here).

*Second,* the "anomalous result" argument is unpersuasive as a reason why, in the guise of judicial interpretation, the courts should, in the words of the district court, supply an "incentive for prompt cleanup by a spiller", when the Congress itself failed to do so. 560 F.Supp. at 801. In the first place, we are uncertain that the denial of such a credit for § 1321(f) liability would, in the usual instance, inhibit the incentive of the discharger to begin immediate cleanup efforts to minimize the liability for the discharge it might have, not only to the United States under § 1321(f), but also to other parties, as might be recoverable by them by virtue of principles of maritime tort law, *see Matter of Oswego Barge*

---

**9.** § 1321(i) ("Recovery of removal costs") provides:

> (1) In any case where an owner or operator of a vessel or an onshore facility or an offshore facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section acts to remove such oil or substance in accordance with regulations promulgated pursuant to this section, such owner or operator shall be entitled to recover the reasonable costs incurred in such removal upon establishing, in a suit which may be brought against the United States Government in the United States Claims Court, that such discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether such act or omission was or was not negligent, or of any combination of the foregoing causes.

\*   \*   \*   \*   \*   \*

*Corporation,* 664 F.2d 327, 334 (2d Cir. 1981), or of provisions of state law, *see, e.g., Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 329–335, 93 S.Ct. 1590, 1594–96, 36 L.Ed.2d 280 (1973) (state statute providing strict no-fault liability for oil-spill damage, without limitation, in favor of state or private persons thereby damaged, was not preempted by the identical predecessor provision of § 1321(f) of the Federal Water Pollution Control Act). Even if we regarded the statutory consequences as anomalous, however, then—as we stated in rejecting a generically similar attack upon "strict statutory construction" of the Act, after noting that "[t]his statute is not a model of clarity"—"[h]owever much the statute in its consequences may seem illogical and inconsistent, it is the work of Congress and up to Congress to correct." *United States v. T/B Arcadian 95,* 714 F.2d 470, 473–74 (5th Cir.1983).

## B. *The Estoppel Contention*

■ The defendant Dixie Carriers maintain that the government induced it to commence the initial cleanup efforts and should, therefore, be estopped to deny the credit sought. Dixie Carriers contend that the Coast Guard misconstrued the Act and mistakenly advised it, by telephone and then by telegram,[10] that Dixie Carriers was legally obligated to remove the spill. Thus, it is argued, Dixie Carriers was unwittingly induced into expending a large sum of money for a cleanup operation, which was coordinated throughout by the Coast Guard, and for which the government now refuses to grant credit to the defendant against the limited strict liability imposed upon it by the Act in favor of the United States for recovery of the latter's cleanup costs.

Pretermitting to what extent the United States may be estopped by its employee's mistaken advice from asserting a remedy provided to it by statute, the critical fallacy in Dixie Carriers' argument is its assumption that the Coast Guard was "mistaken" in advising it of its legal obligation to remove the oil spilled by its vessel.

In essence, the Act prohibits the discharge of oil or hazardous substances into the navigable waters of the United States, § 1321(b)(1), (3), (4), (6), and it authorizes the President "to act to remove or arrange for the removal of the oil at any time, unless he determines such removal will be done properly by the" discharger, § 1321(c). The provisions in § 1321(f) and (g) provide the government a remedy to recover its own cleanup costs from the discharger or a sole-cause third party, a remedy limited in amount as to tonnage-determined or statutory maximum where, as here, the strict no-fault liability is imposed by the Act is applicable. However, while the Act provides for the government's recovery of at least part of the cleanup costs incurred by it, it nowhere relieves the owner of the discharging vessel of his responsibility to clean up the discharge from his vessel in violation of the Act.

The legislative reports contemplated that the government would step in to remove the discharge only if the owner failed or was unable to perform his own obligation to clean up the illegal discharge from his vessel. *See, e.g.,* S.Rep. No. 91–351, quoted *supra, see also* § 1321(c), quoted *supra.* The statutory scheme contemplated thereby, thus, was that § 1321(f) afforded the government a remedy to recover from the discharger at least part of the costs of the

---

**10.** Morriz, Dixie Carriers' manager, testified in his deposition that he was directed in a telephone call by the Coast Guard to "make arrangements to protect the water intakes and start cleaning up." The telegram sent on June 22, 1979, to Dixie Carriers by the Coast Guard reads as follows:

The tank barge 2311 of which you are the owner struck the Huey P. Long Bridge at 1510R 22 Jun 74. The 2311 is losing the crude oil on board at a rate of approx 30–50

GPM. You are advised that under the provisions of the Federal Pollution Control Act you are responsible to remove from the water of the United States any oil spilled. The Coast Guard will monitor clean up operations to determine if they are adequate within the meaning of the Federal Water Pollution Control Act. If your actions are not adequate federal response may be initiated. Cost of federal response would be billed to the responsible party.

cleanup incurred by the government *upon the owner's failure* to do so himself, but neither by express provision of the Act nor by implication from the legislative history did this statutory scheme relieve the owner of his initial and primary responsibility, as contemplated by the Act, to clean up his own illegal discharge.[11]

*Conclusion*

We therefore find that neither the statute nor estoppel require that Dixie Carriers be allowed credit for its own cleanup costs against its obligation to reimburse the government for the latter's cleanup costs as provided by 33 U.S.C. § 1321(f). Accordingly, we AFFIRM the judgment of the district court.

JERRE S. WILLIAMS, Circuit Judge, dissenting:

Perhaps my standards as to how sensible the law should be are too high. Appellant, Dixie Carriers, is a conscientious shipping company. It acted in the best interests of the people and in accordance with congressional policy. It undertook to clean up the oil spill caused by its barge. For its correct and conscientious concern, the majority of the Court now holds that Dixie Carriers must be penalized by paying virtually double its proper liability to the United States government under the statute. Yet the only solid justification which the opinion for the Court gives for this result is that the statute does not provide for credit for "voluntary clean up". Yet what is critical, of course, is that Dixie Carriers expended the sum of money in cleaning up the oil spill under terms of a statute which provided pragmatically that it was doing so on behalf of the government. There is no denial of the basic proposition that if Appellant had done nothing about cleaning the oil spill it could have been held liable to the United States government for only the statutory limit of liability, just a little over one-half the amount that the Court now requires it to pay by refusing to recognize contribution. Solely because Dixie Carriers was conscientious and concerned it must pay virtually double.

The impact of this holding is not adequately dealt with in the majority opinion. After this decision, no lawyer can properly advise a client to clean up an oil spill beyond a minimum extent necessary to protect it from private claims of liability. To advise a company to move ahead as Dixie Carriers moved ahead to deal with an oil spill would render his or her client a serious disservice. It is obvious from this statute that what Congress had in mind was

11. Under legal principles pre-existing enactment of the Act's provisions, a discharger might be required to abate as a nuisance pollution of public waters caused by its discharge, *Illinois v. City of Milwaukee,* 406 U.S. 91, 105–08, 92 S.Ct. 1385, 1393–94, 31 L.Ed.2d 712 (1972). It was early recognized that persons injured by oil pollution of public waters and shores could recover their damages from the discharger on nuisance theory without proof of fault on his part. *Kirwin v. Mexican Petroleum Co.,* 267 F. 460, 463 (D.R.I.1920). The right of a State to recover from the discharger its cleanup costs in removing oil pollution was likewise recognized. *State of Maine v. M/V Tamano,* 357 F.Supp. 1097 (S.D.Me.1973). Oil pollution of waters by a vessel was recognized as maritime tort conferring federal admiralty jurisdiction of a suit by a State to recover its cleanup costs and other damages, *California v. S.S. Bournemouth,* 307 F.Supp. 922, 928–29 (C.D.Cal.1969) (negligence theory) and by private persons to recover their damages thereby sustained, *In re New Jersey Barging Corporation,* 168 F.Supp. 925, 932–37 (S.D.N.Y.1958) (nuisance theory). It was also recognized that, to obtain relief against the discharger for creating a nuisance through oil pollution of waters resulting from his activity, his intent to cause the discharge need not be established, *United States v. Ira S. Bushey & Sons, Inc.,* 363 F.Supp. 110, 120 (D.Vt.), *aff'd,* 487 F.2d 1393 (2d Cir.1973), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3182, 41 L.Ed.2d 1146 (1974). *See, generally, Matter of Oswego Barge Corporation,* 664 F.2d 327, 334 (2d Cir.1981); Comment, Oil Spills and Cleanup Bills: Federal Recovery of Oil Spill Cleanup Costs, 93 Harv.L.Rev. 1761, 1763–65 (1980); Comment, Federal Water Pollution Control Act, 53 Tul.L.Rev. 1421, 1422–24 (1979). Annotation, Federal Common Law of Nuisance as Basis for Relief in Environmental Pollution Cases, 27 ALR Fed. 137 (1976), § 12; Annotation, Damages Compensable under Federal Maritime Law for Injuries Caused by Discharge of Oil into Navigable Waters, 26 ALR Fed. 346 (1976), § 3. In § 1321(*o*), the Act specifically preserved as unaffected by the Act any such pre-existing legal obligations against the owner or operator of the vessel in favor of (at least) the States or private persons.

the cleaning up of oil spills as quickly as possible. But the opinion of the Court in undue rationalization requires an abdication of such responsibility on the part of the company which caused the oil spill. Under any reasonable conclusion, a company must now leave the matter to the United States government to insure that the company be responsible to the government only to the limit of liability which is clearly set out in the statute. The fact that the spilling of oil is made "unlawful" under the statute is obviously for the purpose of making the party liable to the government *up to the limit of statutory liability.*

The clearest and most dominant provision of this statute is the ceiling on liability to the United States government on the part of whomever caused the oil spill. Whether that is a wise limitation or not is not for us to say. It exists in the statute, and it is clear. The holding of the Court in refusing to credit the amount already expended by the company in the clean up to discharge its obligation to the United States government is circumventing the statutory limitation, as this record shows. The simplest balance sheet calculation shows that Dixie Carriers was entitled to a set off or "credit". We allow such set offs routinely without specific statutory authorization. Under the statute Dixie Carriers was liable to the United States government for a total of $121,600. Yet, because of Dixie Carriers' own expenditure on behalf of its obligation to the United States government, the government is relieved of an additional cost of $108,465.86. Any possible amount of liability to anyone else being discharged by the expenditure by Dixie Carriers is totally non-existent under this record. Yet, Dixie Carriers, instead of having its liability limited to $121,600 under the statute finds its liability to be $230,-065.86.

This result leaves me mystified and deeply concerned. Mystified because the Court finds justification in attaching double liability to appellant when if there is anything clear in the statute it is the provision in precise terms for a single maximum liability. Deeply concerned because the result compels those who are responsible for oil spills to do exactly the opposite of what Congress obviously wanted them to do—undertake to clean up the oil spill. The reasoning of the Court leads to an unfair and unwise result. It is too intensely theoretical for me. I dissent.