796 F.2d 1188
 24 ERC 1769, 16 Envtl. L. Rep. 20,956
 The PORT OF PORTLAND, a municipal corporation,
Plaintiff-Appellant/Cross-Appellee,
v.
WATER QUALITY INSURANCE SYNDICATE, a foreign corporation,
Defendant-Appellee/Cross-Appellant.
The PORT OF PORTLAND, a municipal corporation,
Plaintiff-Appellee/Cross-Appellant,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY, a foreign
corporation, Defendant-Appellant/Cross-Appellee.
 Nos. 84-4041 to 84-4043.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 9, 1986.
Decided Aug. 14, 1986.
 
 Katherine H. O'Neil, Wood, Tatum, Mosser, Brooke & Holden, Portland, Or., for Port of Portland.
 Joe D. Bailey, Landis, Aebi, Bailey & Mercer, Portland, Or., for St. Paul Fire & Marine Ins. Co.
 Alex L. Parks, Parks, Montague, Allen & Greif, Portland, Or., for Water Quality Ins. Syndicate.
 Appeal from the United States District Court for the District of Oregon.
 Before SKOPIL, NELSON, and BOOCHEVER, Circuit Judges.
 SKOPIL, Circuit Judge:
 
 
 1
 This is an action brought by the Port of Portland ("Port") against two of its insurers, St. Paul Fire & Marine Insurance Company ("St. Paul") and the Water Quality Insurance Syndicate ("WQIS"). The Port seeks to recover costs and expenses expended in containing and cleaning up an oil slick on the Willamette River. The slick occurred when the Port's dredge, the OREGON, sank at its moorings in the Portland harbor. More than 65,000 gallons of diesel fuel plus various lubricating oils were aboard. The Port contracted with third parties to contain and clean up the pollution and remove the diesel fuel.
 
 
 2
 WQIS and St. Paul denied liability. The district court held both companies liable under their respective insurance contracts. 549 F.Supp. 233 (1982). Damages were apportioned on a ratio to each insurer's policy limits and attorney's fees were awarded to the Port.
 
 
 3
 On appeal the insurers again deny coverage. WQIS contends that attorney's fees are not statutorily available. The Port cross-appeals the district court's exclusion of certain expenses and seeks attorney's fees on appeal.
 
 DISCUSSION
 
 4
 A. Was the dredge OREGON a "public vessel" engaged in commerce and thus covered by the WQIS policy?
 
 
 5
 WQIS is an insurance syndicate offering coverage tailored to liabilities created by the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. Secs. 1251-1376 (1982). The FWPCA is a remedial statute intended to create a comprehensive plan to expedite oil pollution cleanup and allocate and limit liability. Tug Ocean Prince, Inc. v. United States, 584 F.2d 1151, 1162 (2d Cir.1978), cert. denied, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). WQIS's coverage for removal costs of oil is coextensive with FWPCA's liabilities. The Act specifically excludes public vessels unless engaged in commerce. 33 U.S.C. Secs. 1321(a)(3) and (4). The Act does not define "engaged in commerce."
 
 
 6
 The OREGON was used to dredge the Columbia and Willamette Rivers as an aid to navigation. These tasks were performed under contract with the U.S. Army Corps of Engineers. The Port's contract with the Corps of Engineers provided for the Port's recovery of all "actual costs" as well as indirect costs such as maintenance, capital expenditures, insurance, depreciation and standby costs. When the OREGON sank it was being prepared for another dredging season. Its crew had just completed final preparations that included loading fuel oil.
 
 
 7
 On these undisputed facts, the district court granted summary judgment in favor of the Port. The court concluded that the FWPCA was intended to cover a municipality's activity "far removed from traditional state functions, which is more commonly performed by the private sector." We agree.
 
 
 8
 There is no question that municipalities engage in activities which may cause them liability under the FWPCA. See United States v. Massachusetts Bay Transportation Authority, 614 F.2d 27, 28-29 (1st Cir.1980) (transit authority liable for civil penalties for causing oil spills); United States v. City of New York, 481 F.Supp. 4, 6-7 (S.D.N.Y.1979) (city liable for civil penalties for discharges of oil into navigable waters), aff'd without opinion, 614 F.2d 1292 (2d Cir.1979), cert. denied, 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980). Dredging operations have been held to be commercial activities. E.g., Ritch v. Puget Sound Bridge & Dredging Co., 156 F.2d 334, 337 (9th Cir.1946) (dredging contractors engage in commerce for purposes of Fair Labor Standards Act). Further, a city's dredging operations have been held not to be a "governmental" function that would shelter the municipality from liability by its sovereign immunity. MacKay v. Commissioner of Port of Toledo, 77 Or. 611, 152 P. 250, 252-53 (1915).
 
 
 9
 The Port is authorized by state law to "engage in certain commercial activities," including dredging. Or.Rev.Stat. Sec. 778.025(4) (1985). The Port may contract with the federal government to perform dredging work for compensation. Or.Rev.Stat. Sec. 777.110 (1985). Although the OREGON was committed to Corps of Engineers dredging, while on standby it was available by contract to third parties. While the Port did not make a "profit" on its dredging operations, it was still engaged in commerce. See United States v. California, 297 U.S. 175, 183-87, 56 S.Ct. 421, 423-26, 80 L.Ed. 567 (1936) (under traditional function test, state's operation of railroad without profit is interstate commerce); cf. Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 1016-21, 83 L.Ed.2d 1016 (1985) (rejecting functional analysis and holding that commerce clause extends to all intrastate economic activities affecting interstate commerce).
 
 
 10
 Finally, the agency in charge of administering the FWPCA has issued interpretive decisions construing the term "engaged in commerce." These decisions generally support a broad interpretation of commerce so as to narrow the exceptions to the FWPCA. See 429 C.G. Law Bulletin 8, 9 (Nov. 26, 1980); 420 C.G. Law Bulletin 12, 13-14 (Aug. 16, 1978).
 
 
 11
 B. Did the Port of Portland breach the WQIS contract by failing to comply with notice and consent provisions?
 
 
 12
 Paragraph 4 of the general conditions and limitations section of WQIS's policy provides that in the event of an occurrence which may result in a claim, the Port must give immediate notice and must forward to WQIS all information, communications, and processes relating to the occurrence. Section A, fifth subsection of the policy provides coverage for "[c]osts incurred with the consent of the insurers for the removal of oil." WQIS contends that the Port failed to comply with the notice or consent conditions. The interpretation and meaning of words in a contract in light of surrounding circumstances presents a question of law freely reviewable on appeal. Martin v. United States, 649 F.2d 701, 703 (9th Cir.1981).
 
 
 13
 The OREGON sank on Friday, June 17, 1978. That same day the Port's insurance broker inspected the site, observed the emerging oil, and called WQIS to report the spill. The broker left a recorded message. The following Monday, WQIS's manager returned the call and was informed of the spill. The broker, whom the district court found to be a credible witness, testified that he told WQIS's manager that (1) the OREGON sank; (2) the dredge had been ready to depart on a job and carried a substantial amount of fuel that would have to be removed; (3) the Port's oil skimmers were on the site; and (4) a third party's skimmers were also at the spill working to contain and remove the oil. The manager responded by questioning whether the OREGON was a public vessel and outside the policy's coverage. No mention was made of the consent requirement. The Port never received written directions or inquiry from WQIS. The broker testified that he inferred from the conversation that WQIS had consented to the Port's removal efforts.
 
 
 14
 The following day the Port's broker wrote to WQIS to confirm the information given over the phone. He opined that the fuel would soon be removed from the dredge to standby tanks. WQIS received the letter four days later and did not respond or inquire about further removal operations. Documents on the claim were finally compiled and forwarded to WQIS over a year later in July 1979.
 
 
 15
 We agree with the district court that the Port gave WQIS timely notice of the incident. Any delay in providing information to WQIS was excused by the Port's good faith efforts to collect and organize its documentation and the lack of diligence on the part of WQIS to make any effort to increase its knowledge of the circumstances. We further agree that WQIS's silence on the Port's removal operations constituted an acquiescence from which consent can be inferred.[1]
 
 
 16
 C. Is WQIS liable only for excess coverage?
 
 
 17
 WQIS contends that it is an excess carrier and its liability is therefore limited to the amount of damages that exceed the primary insurer's coverage. WQIS argues that St. Paul was the primary insurer with a coverage limitation of $1,000,000. The damages were determined to be $276,802.07. Thus, WQIS contends that it has no liability under its policy.
 
 
 18
 Section 10 of WQIS's policy provides that when there is other valid and collectible insurance with another insurer, WQIS's coverage "shall be in excess of and shall not contribute with such other insurance." Section 35 of the General Conditions of St. Paul's policy provides that its coverage is primary, but that between two coexisting coverages St. Paul's liability shall be prorated.
 
 
 19
 This issue was raised below by each party as a defense to the Port's claim under the respective policies. WQIS relied on the language of the policies. St. Paul relied on a written contract between St. Paul and WQIS that prohibits St. Paul from writing pollution coverage in competition with WQIS except on an excess basis. St. Paul further argued that if WQIS's policy was truly intended to provide only excess coverage, the Port was receiving nothing for its premium payments since the statutory liability under the FWPCA for the OREGON was less than St. Paul's coverage.
 
 
 20
 The district court resolved this issue by invoking the rule established by Lamb-Weston, Inc. v. Oregon Automobile Insurance Co., 219 Or. 110, 341 P.2d 110, as modified, 219 Or. 110, 346 P.2d 643 (1959). In Lamb-Weston, the Oregon Supreme Court held that when "other insurance" clauses cannot be reconciled, the liability to be imposed on each insurer is to be prorated in the ratio the limits of the respective policies bear to the total coverage. Id., 341 P.2d at 119 and 346 P.2d at 647.
 
 
 21
 We conclude that the district court properly invoked the proportionality formula of Lamb-Weston. The Oregon Court of Appeals recently confirmed the applicability of Lamb-Weston in similar circumstances. See Industrial Finishes & Systems, Inc. v. American Universal Insurance Company, 79 Or.App. 614, 720 P.2d 382 (1986). In that case one insurance policy purported to apportion liability among primary insurers on a pro rata basis. The other policy sought to extinguish its liability for coverage to the extent that other applicable insurance existed. The court found the clauses repugnant, thereby invoking Lamb-Weston. Id., 720 P.2d at 385.
 
 
 22
 D. Does the St. Paul Insurance policy include liability for pollution cleanup and abatement costs?
 
 
 23
 St. Paul contends the district court erred in deciding by summary judgment that St. Paul's policy covered the Port's loss. The policy provides in relevant part that St. Paul's coverage extends to occurrences resulting in property damage. Property damage is defined as "[p]hysical injury to or destruction of tangible property." St. Paul argues that oil pollution of water is not damage to tangible property resulting in liability under the policy. The interpretation and meaning of words in a contract presents a question of law reviewed de novo. Martin, 649 F.2d at 703.
 
 
 24
 The issue is whether water is "tangible property." Tangible property is not defined in the policy. In Oregon all water in the state belongs to the public. Or.Rev.Stat. Sec. 537.110 (1985). State laws prohibit the discharge of oil into water and provide for a cause of action to collect for damage caused to the water. Or.Rev.Stat. 468.785-805 (1985); see also Askew v. American Waterways Operators, Inc., 411 U.S. 325, 332, 93 S.Ct. 1590, 1595, 36 L.Ed.2d 280 (1973) (states may prohibit oil spillage in water and provide for recovery of damages from wrongdoer).
 
 
 25
 In Lansco, Inc. v. Department of Environmental Protection, 138 N.J.Super. 275, 350 A.2d 520 (Ch.Div.1975), aff'd 145 N.J.Super. 433, 368 A.2d 363 (N.J.Super App.Div.1976), certif. denied, 73 N.J. 57, 372 A.2d 322 (1977), the state court was faced with virtually the same policy provisions presented here. The court rejected the insurance company's argument that the property damage clause was limited to damage to identifiable physical property. Id., 350 A.2d at 524. The court interpreted the policy provisions to provide coverage for the cleanup of oil pollution in water. Id. at 524-25. Similarly, in Kutsher's Country Club Corp. v. Lincoln Insurance Co., 119 Misc.2d 889, 465 N.Y.S.2d 136, 139 (Sup.Ct.1983), the court held that an oil spill into water constituted property damage as defined in an insurance policy providing for liability for damage to property. "[T]he Court agrees with the plaintiff that [insurer's] assertions that plaintiff has not shown that the petroleum discharged resulted in injury to tangible property is preposterous." Id. In United States Aviex Co. v. Travelers Insurance Co., 125 Mich.App. 579, 336 N.W.2d 838, 843 (1983), the court held that an insurance company was liable under a property damage clause for cleanup costs of chemical contamination of percolating subsurface waters.
 
 
 26
 These authorities support the conclusion that oil pollution to water is injury to tangible property. St. Paul argues, however, that none of these authorities is binding and none directly answers the issue presented. Our obligation in such circumstances is to apply the law as we believe the state supreme court would apply it. Insurance Co. of North America v. Howard, 679 F.2d 147, 149 (9th Cir.1982). We agree with the district court that the "reasonable, enlightened view" that the Oregon Supreme Court would adopt would be that discharge of pollution into water causes damage to tangible property and hence cleanup costs are recoverable under a property damage liability clause.
 
 
 27
 St. Paul argues, alternatively, the term "property damage" is ambiguous, thus precluding summary judgment in favor of the Port. The existence of an ambiguity in a contract is a question of law. State Farm Mut. Auto. Ins. Co. v. Fernandez, 767 F.2d 1299, 1301 (9th Cir.1985).
 
 
 28
 St. Paul argues that the definition of property damage is not immediately apparent from a reading of the policy and therefore evidence of the parties' intent should have been reviewed. The district court rejected this offer of parol evidence. The court found that the provisions of the contract were "clear and explicit" and refused to allow parol evidence to create the alleged ambiguity.
 
 
 29
 Or.Rev.Stat. Sec. 41.740 (1985) generally excludes extrinsic evidence when the terms of an agreement have been reduced to writing. Evidence may be admitted to explain an ambiguity in the contract. In re Truax, 62 Or.App. 130, 659 P.2d 983, 985 (1983). "A term is ambiguous if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation." Oakridge Cablevision Inc. v. First Interstate Bank, 65 Or.App. 640, 673 P.2d 532, 536 (1983). But a contract is not made ambiguous simply because the parties fail to agree on its interpretation. See Boudreau v. Borg-Warner Acceptance Corp., 616 F.2d 1077, 1079 (9th Cir.1980).
 
 
 30
 We conclude that the insurance policy is clear and unambiguous. There is no basis for interpreting the words of the policy in any way except their usual and ordinary meaning. See Western Fire Insurance Co. v. Wallis, 289 Or. 303, 613 P.2d 36, 38-39 (1980) (court will not attribute possible but unlikely meaning to the terms of insurance policy). We agree with the district court that parol evidence should not be allowed in for the purpose of creating an ambiguity. Clearly, if St. Paul had chosen not to insure against loss due to pollution, it could have incorporated such an exclusion into the policy.[2] Since the language is sufficiently unambiguous, the district court did not err in rejecting extrinsic evidence of its meaning. See Knox v. Hanson, 242 Or. 114, 408 P.2d 76, 79 (1965) (when language of contract is clear, court need not review extrinsic evidence of intent); Life Financial Inc. X v. American Guaranty Financial Corp., 74 Or.App. 497, 704 P.2d 122, 124 (1985) (affidavit of party's understanding of contract not admissible to alter plain meaning).
 
 
 31
 E. Is the Port entitled to recover the costs of certain pollution abatement and cleanup that the district court denied on the grounds the costs were primarily for salvage?
 
 
 32
 One day after the OREGON sank the Port elected to pump the 65,000 gallons of fuel oil into standby tanks on shore. The Port's witnesses testified the action was taken because (1) oil was constantly bubbling to the surface; (2) the Coast Guard advised the Port to remove the fuel oil; and (3) the oil was a potential threat of pollution. The costs attributed to fuel pumping was $34,154.86. The court found this cost was incurred as a necessary step in salvaging. Under deferential review, we uphold this finding.[3] Presumably, the oil had some salvage value. In addition, tank pumping was a necessary prerequisite to salvage and to raising the OREGON.
 
 
 33
 The OREGON was raised on August 17, 1978. Shortly thereafter extensive water, pier, and shoreline cleaning were performed at an expense of $27,469.00. The Port allocated the expense to pollution cleanup. The district court found that "post-raising cleanup measures were in large part salvage efforts and not pollution abatement efforts." We cannot accept this finding. Pier and shoreline cleaning is necessary in salvage operations only if there was pollution. Even if the OREGON had not been raised, pier and shoreline cleaning would have been performed. We reverse the court's finding on the allocation of these expenses and remand to allow the court to add these expenses to the judgment in favor of the Port.
 
 
 34
 F. Is the Port of Portland statutorily entitled to an award of attorney's fees?
 
 
 35
 WQIS contends that attorney's fees are not lawfully available to the Port. Ordinarily a prevailing party is not entitled to an award of attorney's fees absent statutory authority or an enforceable contract. International Assoc. of Machinists and Aerospace Workers v. Republic Airlines, 761 F.2d 1386, 1391 (9th Cir.1985).
 
 
 36
 The award of fees here was premised on state law. Oregon law provides that when an insurer fails to settle timely a claim and a plaintiff's recovery exceeds the amount of any tender made by the insurer, "a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon." Or.Rev.Stat. 743.114 (1985). The reasonableness of the award is not at issue here. The dispute is whether section 743.114 is applicable to this action. Questions of state law are reviewable de novo. Matter of McLinn, 739 F.2d 1395, 1398 (9th Cir.1984) (en banc).
 
 
 37
 WQIS contends that its policy is one for wet marine and therefore exempt from section 743.114 by Or.Rev.Stat. Sec. 743.003 (1985). Section 743.003 provides that chapter 743 (including section 743.114) does not apply to wet marine insurance policies. The district court agreed with the statutory interpretation but concluded that WQIS's policy was "general marine" and not "wet marine," and therefore not excluded from the provisions of chapter 743.
 
 
 38
 Wet marine insurance is defined by Or.Rev.Stat. Sec. 731.194 (1985). That section provides in relevant part that wet marine insurance includes:
 
 
 39
 (1) Insurance upon vessels, crafts, hulls and of interests therein or with relation thereto;
 
 
 40
 (2) Insurance of marine builder's risks, marine war risks and contracts referred to in ORS 731.174(2).
 
 
 41
 Or.Rev.Stat. 731.174 (1985) defines marine insurance as:
 
 
 42
 (1) Insurance against any and all kinds of loss of or damages to:
 
 
 43
 (a) Vessels [&] craft ...;
 
 
 44
 (b) Person or to property in connection with or appertaining to a marine, inland marine, transit or transportation insurance, including liability for loss of or damage to either, arising out of or in connection with the construction, repair, operation, maintenance or use of the subject matter of such insurance ...;
 
 
 45
 * * *
 
 
 46
 (d) ... piers, wharves, docks, and slips, ...; other aids to navigation and transportation, including dry docks and marine railways, against all risks.
 
 
 47
 (2) Marine protection and indemnity insurance meaning insurance against, ... loss, damage, or expenses arising out of, or incident to, the ownership, operation, chartering, maintenance, use, repair or construction of any vessel, craft, or instrumentality in use in ocean or inland waterways, including ... damage to the property of another person.
 
 
 48
 There is an obvious overlap in the definitions of wet marine and general marine insurance. Both include the types listed in section 731.174(2). The issue turns on whether WQIS's policy is more like the policy types delineated in section 731.174(1), and therefore a general marine policy, or more like those described in section 731.174(2), which can be wet marine policies. Admittedly, WQIS's coverage does not neatly fit either classification of wet marine or general marine insurance. It is likely that oil pollution insurance for oil spill cleanup liability created by the FWPCA was not contemplated by the Oregon Legislature.
 
 
 49
 We conclude the district court selected the closest definition when it cited to section 731.174(1)(b), which defines marine insurance to include "[i]nsurance against any and all kinds of loss of or damage to ... property in connection with ... transportation insurance." We agree the WQIS policy provisions are more nearly analogous to policy types enumerated in sections 731.174(1)(b) and (d). Accordingly, the WQIS policy is not wet marine but rather general marine. An award of fees to the Port was proper.[4]
 
 
 50
 The Port seeks attorney's fees on appeal. Section 743.114 clearly allows for fees on appeal. The Port may submit an application for fees on appeal.
 
 
 51
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED. Costs are awarded in favor of the Port.
 
 
 
 [1]
 WQIS complains that such "implied consent" gives rise to the possibility of double exposure. See United States v. Dixie Carriers, Inc., 736 F.2d 180, 183 (5th Cir.1984). In Dixie Carriers, the court held that parties responsible for an oil spill were not entitled to have costs incurred in initial voluntary cleanup operations credited against their FWPCA liability. Id. at 184. There can be no double liability in this case because at no point did the federal government participate in the cleanup process
 Nevertheless, WQIS argues the consent and notice provisions were intended to avoid the potential for double exposure by preserving the protection offered by the FWPCA. The FWPCA authorizes the federal government to clean up oil spills if it appears that such removal will not be properly performed by the owner or operator. 33 U.S.C. Sec. 1321(c)(1) (1982). Liability to the spiller (or insurer) of the government's cost of cleanup is limited by the Act. 33 U.S.C. Sec. 1321(f)(1) (1982). WQIS contends that the notice and consent provisions offer it the opportunity to assess the costs and then refuse consent if the cost of cleanup is greater than the potential liability under the Act.
 The district court rejected that argument. It determined that the Port's standing passively so as to induce the federal government to undertake cleanup was "neither a legal nor a practical choice." The FWPCA imposes on polluters the duty to clean up the waters they have polluted. United States v. P/B STCO 213, On 527 979, 756 F.2d 364, 368 (5th Cir.1985). The polluter does not have a choice under the Act to choose not to clean up. Id. at 369; Dixie Carriers, 736 F.2d at 185-86.
 
 
 [2]
 There is an exclusion clause in the policy that provides that coverage is not extended to property damages arising out of the discharge of pollutants into water, except when the discharge is sudden and accidental. St. Paul admits that the sinking of the OREGON was sudden and accidental. St. Paul argues that the exclusion "suggests" that coverage is only for damage to property which is caused by oil in the water and does not extend to the cost of removing pollutants from the water. We agree with the district court that the exclusion clause does not answer whether the policy covers the cleanup and abatement costs
 
 
 [3]
 The Port contends that whether these damages were properly excluded as salvage presents a mixed question of law and fact subject to de novo review. WQIS and St. Paul argue that the categorization of damages is purely factual and must be upheld unless found to be clearly erroneous. We conclude review should be made under the deferential clearly erroneous standard. In United States v. McConney, 728 F.2d 1195 (9th Cir.1984) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 101, 83 L.Ed.2d 46 (1985), we reviewed in detail the standards of appellate review. A mixed question of law and fact requires the court to establish basic, primary, or historical facts, select the applicable rule of law, and then apply that rule of law to the facts. Id. at 1200. The "facts" here are whether certain activities constituted salvage or pollution control. While there are certain historical facts (i.e., the activities taken), there remains only an ultimate factual determination categorizing those activities. There are no rules of law to apply to those facts to determine whether the activities were salvage or pollution control. The determination is a purely factual one founded "on the application of the fact-finding tribunal's experience with the mainsprings of human conduct." Id. at 1202 (quoting Commissioner v. Duberstein, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960))
 
 
 [4]
 WQIS also argues that its policy is a modified version of the standard protection and indemnity ("P & I") policy in that it covers one area of shipowners' liability--pollution hazards from oil--that has been traditionally covered by P & I contracts. We disagree that the policy is a pure P & I policy as section 731.194 seems to require. Traditional P & I policies cover oil pollution damage to third persons. WQIS's policy contains that coverage but the Port did not purchase it. WQIS's coverage is for the new and unique statutory liability created by the FWPCA. By offering that coverage, WQIS is not a pure P & I insurer and hence not a wet marine insurer